[Crim. No. 4329. Third Dist. Nov. 16, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JONATHAN SAWYER et al., Defendants and Appellants.

James Markle, under appointment by the Court of Appeal, John J. Wells and Leonard· P. Burke for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Doris Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—The indictment charged the five defendants with three offenses: count 1, burglary of Alvin Price's residence with intent to commit a felonious assault; count 2, felonious assault upon Alvin Price; count 3, felonious assault upon Gregory Williams. The jury found defendants guilty of first degree burglary, felonious assault upon Price and simple assault upon Williams. The court imposed sentences on the burglary convictions, suspending imposition of sentence on the other charges as parts of a single transaction. Defendants appeal.

One brief has been filed on behalf of defendants Rajotte, Sawyer, Martin and Moore; another on behalf of defendant Kanzler. On a particular afternoon Alvin Price, a Negro, was

riding in a car with his 17-year-old cousin, Gregory Williams, and a third man. They passed a car in which Shirley Rajotte, wife of defendant Rajotte, was riding. She twice made an obscene gesture and called them "niggers." Price and his companions followed the car in their own automobile to a house in the Oak Park District of Sacramento. Price walked over to Mrs. Rajotte and asked why she had called him a name and asked whether she had mistaken them for someone else. Conversation ensued in which Mrs. Rajotte threatened to send the Hell's Angels after him. Price slapped her, causing her to fall, returned to his car and drove off.

A few nights later, shortly after midnight, defendant Rajotte, the other defendants and one McNeal, drove to Price's house in two cars. Price lived with his aunt, Mrs. Williams, and his cousin, Gregory Williams, in a house on San Jose Way in Sacramento. Each of the three occupants of the house testified to the ensuing incidents. Although these witnesses knew none of the defendants, they were able to identify all but Kanzler as participants. Gregory Williams, hearing a knock at the front door, went to the door and opened it slightly. A man whom he identified as Sawyer pushed the door open, entered the living room and started scuffling with him. Williams broke away and ran away into Alvin Price's bedroom, with the man identified as Sawyer following him. There in the bedroom the man again tackled Williams, the two rolling over Price's bed. Williams called out to Price to get his gun.

Price became conscious of Williams and the other man wrestling and tumbling across his bed. He heard Williams calling out to him to get his gun. In the darkened room Price arose and saw several men entering. He was attacked by these men and fought back. He knew the reason for the action when he heard something like, "I'll teach you about hitting a woman." Price was hit across the back with a club and ducked the swing of a one-foot chain. He fought his way to the dresser where he kept a .22 caliber pistol loaded with eight bullets. He knew that Gregory was on the floor. Price fired all eight shots in rapid succession. He turned the light on and saw Sawyer on top of Williams. Price told him to get up but Sawyer did not. At that point Price hit Sawyer on the side of the head with the butt of his gun. As Sawyer arose, Rajotte appeared with a .38 caliber pistol, knocked the gun from Price's hand and fired one shot at Price. Price and Sawyer

then started wrestling. Sawyer was getting the best of Price when Rajotte told Sawyer that they should leave. The two men picked up McNeal, who had been wounded and who was lying on the floor between the bedroom and kitchen. They carried him outside.

Mrs. Williams had been in the front bedroom when she heard a soft knock at the door. She heard scuffling and saw three or four people pass her bedroom door. She ran into the living room where two men she identified as Moore and Martin came up behind her with guns and told her to stand still, saying that they did not want to hurt her. They left her within a few moments and she went outside, calling for help.

The defendants drove away and the police arrived a few moments later. They found Price in a state of shock. One officer saw a lump on the back of Price's head about the size of an orange. They noticed that Price's bedroom was in complete disarray. On a chair outside the bedroom there was a wooden stick which could have been an ax handle. There was blood on the floor and bullet holes in the walls. Price was taken to the hospital. He had suffered numerous welts and abrasions about the neck and both shoulders, which might have resulted from being struck with a stick or club. McNeal, who was not tried with defendants, suffered a bullet wound in his neck and was in critical condition. Both Moore and Rajotte received bullet wounds in the abdomen.

Each defendant testified. Each substantially corroborated the other's testimony. On the night of the affair Rajotte had driven to Sacramento from the Bay Area, arriving in the house in which his wife was living at about 11:30 p.m. With him were his friends Martin, Moore and Sawyer. Kanzler and McNeal, with lady friends, were there. Seeing bruise marks on his wife's face, Rajotte took her into the kitchen away from the others to find out what had happened. She told him that a friend had ascertained Price's name and address. Rajotte decided that he would go to see if Price was the person who had slapped his wife. Rajotte admitted that if Price turned out to be the person, he intended to press him into a fight. Rajotte discussed the matter with McNeal, who offered to join him. Without knowing the purpose of the trip, Moore joined them and was told of the purpose enroute. Generally, Rajotte and Moore testified that Gregory Williams admitted them to the house to talk to Price, became "buggy" when they mentioned the slapping incident, yelled for Price to get his gun; that Price

started shooting; that Moore and McNeal fell, that Rajotte (although hit) wrestled with Price to get his gun.

Kanzler left the Rajotte house with Sawyer and Martin as his passengers and parked near Price's house on San Jose Way. Generally, they testified that they saw figures go up to the porch, heard shots and went up to the house. Sawyer went in and helped Rajotte, who was dragging out the wounded McNeal. Kanzler took all the defendants but Rajotte to the county hospital. Enroute Kanzler took a Luger pistol from the glove compartment of his car and threw it away. Rajotte drove home, then was taken to the hospital. All the defendants denied carrying or seeing any of the other defendants carrying a gun, club or chain. A slug found in the middle bedroom had been fired by a .38 caliber pistol, which was never found. Kanzler's Luger, found near the hospital, did not shoot .38 caliber bullets. Bullets of that caliber were found in McNeal's pockets.

### Accomplice Instructions

All defendants assign error in the court's omission of instructions requiring corroboration of an accomplice's testimony (Pen. Code, § 1111) and warning the jury that an accomplice's testimony should be viewed with distrust (as required by former Code of Civil Procedure section 2061, applicable to pre-1967 trials). Kanzler in particular points to testimony of his codefendants establishing his participation in the expedition; his presence outside Price's house after driving his two passengers there at high speed and of his being told during the ride that Rajotte was going to see someone about an incident involving the latter's wife. This testimony of his codefendants, according to Kanzler's argument, was incriminating evidence by alleged accomplices, requiring appropriate instructions to the jury.

When one of several defendants takes the stand to confess his own guilt and incriminates his codefendants, the accomplice instructions should be given. (*People* v. *Catlin,* 169 Cal.App.2d 247, 254-255 [337 P.2d 113] ; see, e.g., *People* v. *Hill,* 66 Cal.2d 536, 555-556 [58 Cal.Rptr. 340, 426 P.2d 908].) If, however, each of several defendants testifies in his own defense and none is called as a witness for or against the others, the instructions are not appropriate. (*People* v. *Gurule,* 236 Cal.App.2d 847, 854-855 [46 Cal.Rptr. 459].) Even where one defendant denies participation and incriminates another, the instruction should not be given. (*People* v. *Arends,*

155 Cal.App.2d 496, 512-513 [318 P.2d 532].) ■ None of the defendants admitted guilt or directly incriminated the other. Each admitted making the trip to Price's house with the other codefendants, but all voiced the theme of innocent involvement. None implicated himself or the others as participants in a preconcerted housebreaking and assault. Under these circumstances the accomplice instructions would have prejudiced the defendants since the jury would have been told to distrust them all. (*People* v. *Catlin, supra,* 169 Cal.App.2d at pp. 254-255.) No error occurred at this point.

### Criminal Intent Instructions

Kanzler assigns error in an instruction on general criminal intent, relying upon the rule proscribing a general intent instruction where a specific intent crime, such as burglary, is charged. The other defendants adopt this contention.

Burglary, one of the crimes charged, requires proof of specific intent to commit theft or a felony. (1 Witkin, Cal. Crimes (1963) § 458.) ■ When a specific intent crime is charged, a jury instruction on general criminal intent without explanation or qualification constitutes error. (*People* v. *Holquin,* 229 Cal.App.2d 398, 403 [40 Cal.Rptr. 364].) ■ The five defendants were on trial not only for burglary, but for aggravated assault. The latter crime requires proof only of general criminal intent. (1 Witkin, Cal. Crimes (1963) § 264.) Thus the court was obliged to instruct the jury on the intent concept applicable to each of these crimes. The court instructed the jury on the elements of assault and on the subject of general intent, then gave a specific intent instruction with explanatory statements, making it clear that the specific intent requirement applied only to the burglary count.[1] The court's explanation adequately communicated the

---

[1]After instructing the jury on the elements of assault and on general intent, the court gave the following instructions:

"In the case of certain *other* crimes *however* it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"Thus in the crime of Burglary as contained in *Count One,* a necessary element is the existence in the mind of the perpetrator of the specific intent to commit a felonious assault *and this intent must so exist at the time of the entry;* and unless such intent so exists that crime is not committed."

"The specific intent with which an act is done may be manifested by the circumstances surrounding its commission. But you may not find a defendant guilty of the offense charged in Count One [burglary] unless the proved circumstances not only are consistent with the hypothesis that he had the specific intent to commit a felonious assault but are irreconcilable with any other rational conclusion." (Italics supplied.)

idea that burglary required proof of specific and not general criminal intent. The instructions were proper.

### Self-Defense Instruction

The defendants other than Kanzler claim error in the rejection of a proposed jury instruction to the effect that when the victim of a simple assault indulges in a sudden and deadly counter assault, the original aggressor need not attempt to withdraw and may use reasonably necessary force in self-defense. The proposed instruction was based on *People v. Hecker*, 109 Cal. 451 [42 P. 307, 30 L.R.A. 403]. (See also 1 Witkin, Cal. Crimes (1963) pp. 155-156.) Although the requested instruction expresses a correct rule, its rejection was not improper since the trial judge adequately covered the subject by reading the jury CALJIC 623 with an appropriate interpolation.[2] When a jury is properly instructed on an applicable rule of law, it is not necessary to restate the rule in another way. (*People v. Chapman*, 207 Cal.App.2d 557, 579-580 [24 Cal.Rptr. 568].)

### Sufficiency of the Evidence—Kanzler

Kanzler was tried on the prosecution theory that he was an aider and abettor in a planned burglary and assault, having stationed himself outside the victim's house as a lookout and as the driver of a getaway car. He asserts the absence of substantial evidence to support the jury's verdict of guilt.

There was substantial evidence, which the jury accepted, that the men who entered Price's house did so with the intent to commit a felonious assault. Rajotte had testified that he went to the house to talk to Price and, if he were the person who had slapped Rajotte's wife, he would be pressed into a fight. He was accompanied on his expedition by five friends in two automobiles, the group being armed with several guns and a club. Although the defendants testified that their eventual destination was a party, the group left their female companions behind. Kanzler admitted that before leaving Rajotte's house, he had some awareness of an incident involving Mrs.

---

[2]The trial court instructed the jury as follows:

"Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he first must decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest *unless the attack is so sudden and perilous that he cannot withdraw.* Only when he has done so will the law justify him in thereafter standing his ground and using force upon his antagonist." (Italics supplied.)

Rajotte; that he connected the incident with the house on San Jose Way; that he heard Rajotte and McNeal say they were going to San Jose Way; that he drove to the San Jose Way house after Rajotte, although the latter's car was not in view. According to Martin's testimony, Kanzler was driving at high speed. At first Kanzler parked a short distance from the Price house, then, hearing the sounds of the fight, moved his car in front of the next door house. At the conclusion of the battle, he drove his companions to the hospital, getting rid of a pistol enroute.

■ In *People* v. *Butts*, 236 Cal.App.2d 817, 836 [46 Cal. Rptr. 362], this court stated: ''The test of aiding and abetting is whether the accused in any way, directly or indirectly, aided the perpetrator or advised and encouraged commission of the offense with knowledge of the latter's wrongful purpose.'' An inference of aiding and abetting may reasonably be drawn from acting as a lookout or driving a getaway car. (*People* v. *Belenger*, 222 Cal.App.2d 159, 163-167 [34 Cal. Rptr. 918].) ■ The circumstances reasonably justified the jury in concluding that Kanzler was present with knowledge of his codefendants' unlawful purpose, to act as a lookout and to transport some of the perpetrators from the scene. When the circumstances reasonably justify the fact trier's findings, the reviewing court's opinion that the circumstances might also be reasonably reconciled with a contrary finding does not warrant reversal. (*People* v. *Hillery*, 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].)

### Misconduct of Prosecutor

In cross-examining Kanzler, the prosecutor elicited the fact that he had been stopped by the police while driving in San Luis Obispo County 10 days after the affair at Price's house; that he was with some members of an organization known as Hell's Angels and at that time had a pistol in his car. Kanzler's attorney objected to the line of questioning but was overruled on the theory that Kanzler had previously denied frequent associations with members of the Hell's Angels group.[3] At a later point the prosecutor returned to the San Luis Obispo incident, inquiring as to the kind of gun, asking whether the gun had been concealed and what defendant was doing with the gun. Again, the defense objected and this time the objection was sustained. Later, notwithstanding the

---

[3]The codefendants appear to have been members of the Hell's Angels organization, Kanzler was not.

court's ruling, the prosecutor again alluded to the San Luis Obispo incident, asking whether the police had seized the pistol, inquiring whether Kanzler had another pistol with him at the time; asking why he had a gun with him in San Luis Obispo and why he had not left it at home. Again, a defense objection was sustained. On three occasions the prosecutor referred to the circumstance or possibility that the gun involved in the San Luis Obispo incident had been "concealed."

The prosecutor's questioning constituted misconduct. The gun incident in San Luis Obispo occurred 10 days after the Price affair. It had no probative value as respects Kanzler's participation in that affair. Evidence of the defendant's bad character in the form of specific instances of misconduct was inadmissible when offered to prove his conduct on a specified occasion. (See Witkin, Cal. Evidence (2d ed. 1966) §§ 324, 329; Evid. Code, § 1101, codifying prior California rule.) Neither could the prosecution impeach his credibility by evidence of particular wrongful acts. (*People* v. *Covert,* 249 Cal.App.2d 81, 90 [57 Cal. Rptr. 220]; *People* v. *Blalock,* 238 Cal.App.2d 209, 224 [47 Cal.Rptr. 604]; see former Code Civ. Proc., § 2051, operative at the date of trial.) The evidence was not directed at proof of identity. motive or common scheme. (See Evid. Code, § 1101, subd. (b).) Irrelevant to proof of the offense and inadmissible as impeachment, such evidence could only vilify the defendant as a person having criminal proclivities, an impermissible objective. (See *People* v. *Perez,* 65 Cal.2d 615, 619 [55 Cal.Rptr. 909, 422 P.2d 597]; *People* v. *Covert, supra,* 249 Cal.App.2d at p. 83.)

Although Kanzler's trial counsel made several objections to the prosecutor's impermissible efforts, he did not assign the questioning as misconduct or request an admonition to the jury. The court on one occasion directed the jury to disregard "the last question and answer." The jury were not instructed to disregard the gun possession incident. The appeal to bias was heightened during jury argument when the prosecutor, disregarding the limited purpose of evidence of the San Luis Obispo incident, alluded to it as proof that Kanzler was accustomed to keeping guns in his car. Kanzler's counsel objected and the court then instructed the prosecution to observe the limited purpose of the evidence.

Where the evidence is closely balanced and misconduct has contributed materially to the verdict, a miscarriage

of justice results and article VI, section 13, of the state Constitution requires reversal without regard to objections and admonitions. (*People* v. *Lyons*, 50 Cal.2d 245, 262 [324 P.2d 556]; *People* v. *Sorenson*, 231 Cal.App.2d 88, 92-93 [41 Cal.Rptr. 657].) Although it was adequate to justify a jury inference, the evidence that Kanzler had advance awareness of his companions' intent to commit burglary and felonious assault was highly circumstantial. His activities were consistent with service as a lookout or getaway man in a felonious design, but also consistent with foreknowledge of nothing more than a challenge to fight or simple assault. Kanzler was the only member of the group as to whom there was no evidence of entry into Price's house. His action in getting rid of the Luger pistol was consistent with consciousness of guilt and equally consistent with an understandable desire to avoid police curiosity toward one who was transporting gunshot-wounded men to a public hospital. There is a reasonable probability that the verdict was strongly influenced by the jury's belief that Kanzler was an habitual carrier of concealed guns, addicted to aggressive, unlawful action. We have concluded that the prosecutor's misconduct was prejudicial as to Kanzler.

The other defendants make claims of misconduct in the course of the prosecutor's jury arguments, as follows: (a) In both his opening and closing arguments the prosecutor asserted as facts matters which were not in evidence. (b) On 12 occasions he addressed jurors individually. (c) He spoke contemptuously of the public defender. (d) He made frequent improper references to the probable consequences of the jury's failure to convict. (e) He sought to arouse the jury's passion and prejudice by numerous references to the Hell's Angels.

 Several of the prosecutor's comments elicited no objection, could have been cured by jury admonition and will not be considered on appeal. (*People* v. *Ing*, 65 Cal.2d 603, 613 [55 Cal.Rtpr. 902, 422 P.2d 590].) Others were the subject of court admonitions which cured the error. if any. (*People* v. *Perez*, 58 Cal.2d 229, 247 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946].) Others were within the permissible range of prosecution argument. (*People* v. *Burwell*, 44 Cal.2d 16, 39-40 [279 P.2d 744].) Addressing arguments to individual jurors as ''sir'' and ''ma'am'' was improper but not prejudicial. (See *People* v. *Wein*, 50 Cal.2d 383, 395-396 [326 P.2d 457].) Several references to one of the defense attorneys lacked the desirable degree of impersonality

and courtesy but caused no prejudice. Arguments assailed as attempts to intimidate the jury amounted essentially to appeals to convict the defendants. (See *People* v. *Seach,* 215 Cal.App.2d 779, 784-785 [30 Cal.Rptr. 499].)

█ The prosecutor's references to defendants' membership in the Hell's Angels arouse more concern. At several points he indicated the group's "potential for violence" and "infamous reputation." Under some circumstances statements of this sort would be prejudicial, arousing bias and tending to judgments of guilt by association. A trial attorney alert to protect his record on appeal would be extremely chary of such references. Some of the allusions to membership in the Hell's Angels Association fall within the category of invited error, since the defendants injected their connection with the organization into the case during jury impanelment and in their direct testimony. Limited comment on defendants' membership was within the realm of fair argument, since the prosecution was attempting to show a conspiratorial scheme by the group to avenge an insult against a wife of one member. The district attorney overstepped permissible bounds in referring to the group's "infamous reputation," a matter not in evidence and of doubtful admissibility in any event. A defense objection at that point elicited a warning from the court to stay within the evidence. That warning together with the court's informal jury admonitions to decide the case on the facts and the standard instruction against accepting statements of counsel as evidence were adequate safeguards against jury bias. When the entire record is considered, no unfairness resulted from the improper argument.

### New Trial Motion

The defendants later sought a new trial on a claim of newly discovered evidence. The motion was supported by the affidavit of Robert Benny, an inmate of the Sacramento County jail. Benny's affidavit recited in substance that he was in the jail holding tank when he overheard a conversation between Alvin Price and another jail inmate, in which Price stated that the Hell's Angels (i.e., defendants) had received a raw deal; that in fact his cousin had opened the door of the house for their entry and that he, Price, had been waiting for them and had his gun out; that he shot them as he came in the door. The conversation allegedly occurred about two weeks after the trial ended.

In opposition to the motion the prosecution submitted an affidavit by Price denying that he had made the statements described by Benny and declaring that he had been in his private cell, not in the jail holding tank, on the day in question. An affidavit of a jail official supported Price's claim that he had not been in the holding tank on that day.

█ The trial court's order denying the new trial motion is assailed on appeal. Grant or denial of such a motion is discretionary with the trial court, and a reviewing court will interfere only for abuse of discretion. (*People* v. *Williams,* 57 Cal.2d 263, 270 [18 Cal.Rptr. 729, 368 P.2d 353].) Even where the trial witness himself files a sworn retraction, the trial judge may weigh its credibility and reject it if he deems it unworthy of belief. (*People* v. *Langlois,* 220 Cal.App.2d 831, 834-835 [34 Cal.Rptr. 116].) Here the retraction was offered by one who claimed to have overheard the witness, while the witness himself denied the retraction. In exercising its discretion, the trial court could compare the conflicting statements, consider the likelihood of the claimed retraction in relation to the circumstances in which it was allegedly made and in the light of the trial evidence, then decide that it was unworthy of belief. Its decision was well within the bounds of discretion.

The judgment of conviction of defendant Kanzler is reversed; the other judgments affirmed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied December 13, 1967, and the petition of appellants Rajotte, Sawyer, Martin and Moore for a hearing by the Supreme Court was denied January 11, 1968.