[No. B006295. Second Dist.; Div. Four. Oct. 15, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GEORGE ALMARAZ, Defendant and Appellant.

COUNSEL

Joseph F. Walsh, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Gary R. Hahn and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ARGUELLES, J.**—Defendant and appellant, Daniel George Almaraz, appeals his conviction of first degree murder (Pen. Code, § 187),[1] with the special circumstance of killing a witness to prevent his testimony in a criminal proceeding (§ 190.2, subd. (a)(10)), with use of a firearm (§§ 12022.5, 1203.06, subd. (a)(1)); two counts of kidnaping (§ 207) with use of a firearm (§§ 12022.5, 1203.06, subd. (a)(1)); and robbery (§ 211) with use of a firearm (§§ 12022.5, 1203.06, subd. (a)(1)).

FACTS

*The People's Case*

At about 8 p.m. on Sunday, December 5, 1982, Russell Walker and Aaron (Bruce) Collier went to the El Torito restaurant on Redondo Beach pier, where they met Jimmy Tokumoto. Later, they left the restaurant and went to Walker's brother's house; then Walker, Tokumoto and Collier went to a

---

[1]All references are to the Penal Code, unless otherwise indicated.

Stop 'n' Go at 154th and Crenshaw. From there, Tokumoto made a phone call and returned to the car with some beer.

Tokumoto said, "We're going over to my home boy's house." He asked Walker to go as his "back-up." The three of them went to an apartment at 14724 Chadron Avenue in Lennox, at about 10 p.m. When they entered, they found five people inside, including appellant, codefendant Robert Almaraz, codefendant Miguel (Mike) Amaro, and Jeff Sagmeister, who also lived in the apartment.[2]

Tokumoto and appellant were seated at the kitchen table, when Tokumoto jumped up and said, "Fuck you!" to everyone. He turned the table over on appellant. Appellant and Tokumoto then started fighting. Appellant fought with a .38 snub-nosed revolver in his hand. Sagmeister took the gun away from appellant, and appellant and Tokumoto kept fighting. Appellant called for help, and Robert Almaraz went into the kitchen and hit Tokumoto on the head twice with a .357 magnum. Tokumoto fell to the floor, then Robert Almaraz pointed the gun at Tokumoto and fatally shot him. Robert Almaraz then appeared very confused and walked into the bedroom.

Appellant asked Sagmeister to give his gun back, and Sagmeister did so. Sagmeister also closed the drapes and cleaned up the blood at appellant's request. Appellant then approached Walker, who was still sitting on the couch, and asked him why he had come over. Walker said he had come over "to drink a beer."

Appellant said, "You're lying," and pointed his gun at Walker's mouth. Walker then said that he had come over to back up Tokumoto. Appellant then told Walker to give him his wallet and Walker did so, after removing his money. Appellant then took Collier's wallet also, taped his hands behind his back and taped his mouth. Then he taped Walker's hands and mouth the same way. Robert Almaraz was guarding the door, and Amaro helped appellant tape Collier a second time.

Robert Almaraz ordered Walker and Collier to leave the apartment at gunpoint. Appellant said that if there were no "John Wayne's" everything would be okay. They went outside and got into a station wagon which Amaro had brought around. Amaro drove, appellant was in the front seat, and Robert Almaraz was in the back with Walker and Collier.

While they were driving, appellant said, "You know where the cemetery is." Eventually, the station wagon stopped in front of a construction site in

---

[2]Codefendants Robert Almaraz and Miguel (Mike) Amaro are not parties to this appeal. Appellant and Robert Almaraz are not related.

Manhattan Beach. Robert Almaraz ordered Walker and Collier to get out. Walker had worked his hands free, and when he got out, he ran and hid behind a van down the block. After he started running, he heard a gunshot. While he was hiding, he saw Robert Almaraz walk by on the sidewalk. Later, the station wagon drove by slowly. Walker knocked on several doors and eventually got someone to call the police.

The police officer who responded to a radio call regarding shots fired at 1450 Marine Avenue in Manhattan Beach saw Robert Almaraz step off a lawn at that address. He said, "Police Freeze!" and Robert Almaraz stepped behind a telephone pole. He would not come out from behind the pole until the third request. He was searched and found to have two knives and two wallets. A blue steel Smith and Wesson .357 magnum was found behind the telephone pole. It contained one expended cartridge and five live rounds. One of the wallets contained Russell Walker's identification.

A police radio broadcast then came in regarding someone requesting help nearby, and the officer contacted Walker. He was taken to the arrest scene and identified Robert Almaraz.

About 45 minutes to an hour and a half after the shooting, Amaro returned to the apartment. He told Sagmeister, "One got away and Robert's still out there." Appellant returned to the apartment and the three of them removed Tokumoto's body. They put it in the back of the station wagon, and appellant and Amaro told Sagmeister to follow them in his car because they were going to leave the station wagon and wanted a ride back. However, Sagmeister lost them in a heavy fog and went back to the apartment. Appellant called and said they did not need a ride back.

About 6:15 a.m. on December 6, 1982, Mike Amaro was arrested at Compton Avenue and Chadron for driving under the influence of alcohol. Appellant was seated in the passenger seat. He was coherent and did not appear to be excessively intoxicated.

About 11:40 p.m. on December 5, 1982, Paul Heisinger, who was arriving for work at Continental Airlines, heard two gunshots near the area where Bruce Collier was found shot. When Heisinger left work at 8:20 a.m., on December 6, he saw police officers and ambulances and saw Collier lying dead on the sidewalk. He told the officers about the shots he had heard.

Collier's body was found lying on a grassy parkway on El Segundo Boulevard. His hands were tied behind his back.

Tokumoto's body was found behind a dairy in Gardena. There was no wallet on it.

Blood of a type consistent with Tokumoto's, but not with Collier's, was found in the station wagon and the apartment.

The deputy medical examiner testified that Tokumoto died as a result of a gunshot wound to the neck.. Collier was killed by three gunshot wounds, in the head, the neck and the back. Tests revealed that a bullet recovered from Tokumoto's body was fired from the gun recovered when Robert Almaraz was arrested.

*The Defense*

Neither appellant nor Robert Almaraz testified.

Codefendant Miguel (Mike) Amaro testified in his own defense that on December 5, 1982, he was living in an apartment with appellant. Six other people also lived there. On that evening, Tokumoto, Walker and Collier visited. He observed the fight between Tokumoto and appellant, but his version differed from Walker's, in that he testified that Tokumoto was shot when the gun discharged as Robert Almaraz used it to hit Tokumoto.

Amaro also testified that he was afraid of appellant because he had seen appellant beat up several people before. He had seen appellant beat one person's head against a pool table, beat another person in the head with a pool stick and throw a girl through a glass window. Appellant had told Amaro that he had been in prison for murder. Amaro testified that because of what he knew of appellant, he was afraid he would be killed if he did not follow his orders to be quiet and do as he was told. Amaro drove the station wagon with appellant, Robert Almaraz, Walker and Collier. When Walker ran away, appellant ordered Robert Almaraz to go after him. Amaro then heard two shots fired by appellant. Appellant got back in the car and told Amaro to look for Robert. They did not find Robert in the area. They then drove according to directions by appellant to another location with Collier. There, appellant took Collier out of the car and shot him in the head. After he fell, appellant shot him two more times. They then returned to the apartment to dispose of Tokumoto's body.

On cross-examination, Amaro testified that he had known appellant since 1976, that he had gone to live with appellant because he had no other place to go, and that he had seen appellant about once a week, except for one 3-year period. He had not met Walker, Collier or Tokumoto before December 5, 1982. When the fight broke out and Tokumoto was shot, he flashed back

to the suicide of his father. When Tokumoto was lying on the floor, no one moved to call the paramedics or help him. Amaro was not frightened at that time. When appellant was taping Collier and Walker, he said he was going to let them go.

*Procedural History*

In count I, Robert Almaraz alone was charged with the murder of Tokumoto. In count II, all three defendants were charged with the murder of Collier, with the special circumstance of killing Collier to prevent his testimony as a witness, and, as a further special circumstance, that the murder occurred during the course of a kidnaping and a robbery. (Pen. Code, § 190.2, subd. (a)(17).) It was further alleged in count II that as a special circumstance, Robert Almaraz had murdered Collier on the same date as Tokumoto. It was also alleged that appellant and Amaro had each personally used a firearm. In count III, all defendants were charged with robbery of Collier, and appellant and Robert Almaraz were alleged to have each personally used a firearm. In count IV, all defendants were charged with kidnaping Walker, and appellant and Robert Almaraz were alleged to have each personally used a firearm. In count V, all defendants were charged with kidnaping Collier, and appellant and Robert Almaraz were alleged to have each personally used a firearm. In count VI, all defendants were charged with robbery of Walker, and appellant and Robert Almaraz were alleged to have each personally used a firearm.

It was also alleged that appellant had a prior felony conviction of voluntary manslaughter.

Appellant moved before trial for severance of his trial from that of Amaro, on the ground that Amaro intended to testify that appellant actually killed Collier; that Amaro's participation was coerced by his fear of appellant; and that he was afraid of appellant because appellant had been to prison for voluntary manslaughter and was a violent man. The motion was denied.

Appellant admitted his prior felony conviction, and his *Beagle* motion was granted.

At the close of the People's case, the court granted the motion of all three defendants for acquittal as to the special circumstance allegation in count II that the murder of Collier had been committed during the course of a kidnaping and robbery. (Pen. Code, §§ 190.2, subd. (a)(17), 1118.1.)

Appellant then again moved to sever, on the ground that Amaro would testify that appellant used a firearm in the murder of Collier. The motion was denied.

During Amaro's testimony in his own defense, counsel asked him why he was frightened of appellant. Counsel for appellant objected on the ground of relevancy. The court commented that the evidence might be inadmissible under Evidence Code section 352, because the anticipated answer of Amaro would be prejudicial to appellant. Counsel for Amaro agreed that Amaro's defense would be in part that he participated in the acts against Collier and Walker because he was afraid of appellant due to appellant's history of violence; that he participated by driving the station wagon because he was afraid of appellant; and that he had no specific intent to kill Collier.

Amaro moved to sever his case from appellant's in the event the court would rule that his testimony on this issue was inadmissible due to prejudice to appellant.

Appellant then again moved to sever should Amaro's testimony be admitted, on the ground that this testimony could not be admitted against appellant if appellant were tried separately.

In ruling on the motion, the trial judge heard the testimony of Amaro on voir dire, out of the presence of the jury. Amaro testified that appellant threatened to stab him if he did not keep quiet about the killings; that he had seen appellant beat people up and engage in other violence; and that appellant was a bully. Amaro also testified on voir dire that after Tokumoto was shot, appellant told Amaro to drive the car and keep his mouth shut and do as appellant said.

The court denied the severance motion and allowed Amaro's testimony, but said the jury would be instructed on its limited purpose. The jury was thus instructed when the Amaro testimony was given[3] and again at the close of evidence.

Appellant was found guilty of the first degree murder of Collier on count II, and the special circumstance that Collier was killed as a witness to a crime was found to be true (Pen. Code, § 190.2, subd. (a)(10)), along with the allegation of personal use of a firearm. He was found not guilty of the robbery of Collier on count III; but was found guilty of the robbery of Walker and the kidnaping of Walker and Collier, as alleged in counts IV through VI, all with the appellant personally using a firearm.

---

[3] "THE COURT: . . . . [¶] Ladies and Gentlemen of the Jury, this evidence is being admitted for a very limited purpose only. [¶] What factual matters that Mr. Amaro may relate as a basis of why he had a certain state of mind are not proof of any fact as they would relate to Danny Almaraz. [¶] It's only admitted for the limited purpose of showing what Mr. Amaro's state of mind was on the occasion of these events that we're concerned with. [¶] You're to consider this evidence only for that limited purpose. [¶] Will you do that, please? [¶] (The jurors nod their heads affirmatively.)"

Codefendant Amaro was found not guilty of the robberies of Collier and Walker, and the jury failed to reach a verdict on the remaining counts. Robert Almaraz was found guilty of several of the counts, the details of which are irrelevant to this appeal. Amaro was retried.

## CONTENTIONS

Appellant contends that: (1) "The court erred in denying appellant's motion to sever his case from the co-defendant Michael Amaro"; (2) "The evidence is insufficient to support the special circumstances allegation of killing of a witness to a crime within the meaning of Penal Code section 190.2 (a)(10)"; (3) "The court erred in failing to sua sponte instruct the jury that the testimony of Michael Amaro should be viewed with caution because he was an accomplice"; and (4) "The prosecutor engaged in misconduct in arguing to the jury reasonable doubt." (5) Appellant also urges the court to reduce his sentence in light of *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].

## I. *Severance*

■ Appellant contends that his motions to sever his trial from Amaro's were improperly denied, creating prejudicial error, because Amaro claimed that appellant shot Collier and because Amaro testified that appellant had previously attacked people and had been to prison for murder.

■ The existence of abuse of discretion in denying a motion to sever must be determined as of the showing when the motion is made, and not by later-revealed circumstances. (*People* v. *Romo* (1975) 47 Cal.App.3d 976, 984-985 [121 Cal.Rptr. 684], disapproved on another point in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].) However, whether improper denial of severance has resulted in prejudice must be determined from what occurred at trial. (*People* v. *Massie* (1967) 66 Cal.2d 899, 923 [59 Cal.Rptr. 733, 428 P.2d 869].)

■ A conviction will not be reversed for improper use of a joint trial unless there is a reasonable probability that the defendant would have attained a more favorable result in a separate trial. (*People* v. *Massie, supra,* 66 Cal.2d 899, 922-923.)

■ In *People* v. *Goodall* (1982) 131 Cal.App.3d 129, 141 [182 Cal.Rptr. 243], the court held that joint trial was not prejudicial, even though evidence of prior uncharged incidents was admissible against only some of the defendants, where an instruction that the jury was to consider the evidence against certain defendants and not others was adequate to cure

the prejudice. Some of the four defendants had been involved in admissible prior incidents of manufacturing PCP, and the others contended that it was prejudicial error to deny a severance motion. That case was distinguishable from the present case, because none of the defendants gave damaging evidence against the others.

However, in the recent case of *People* v. *Turner* (1984) 37 Cal.3d 302, 312-313 [208 Cal.Rptr. 196, 690 P.2d 669], our state's Supreme Court held that two defendants charged with murder were not denied a fair trial or due process of law by being tried jointly, even though one of them did not testify, and the other one testified that they had planned to burglarize a house, but that the testifying defendant had run away, while the nontestifying defendant continued with the break-in and shot and killed the occupants. ■ The court held that a conviction must be reversed where "a gross unfairness has . . . deprive[d] the defendant of a fair trial or due process of law. . . . [¶] [N]o denial of a fair trial results from the mere fact that two defendants . . . have antagonistic defenses and one defendant gives testimony that is damaging to the other and thus helpful to the prosecution." (At p. 313.)

■ The present case is strikingly similar to *People* v. *Turner, supra,* 37 Cal.3d 302. The defenses are not completely conflicting, because there is little disagreement about most of the events. However, one codefendant testified that appellant had been the instigator of the second murder, had pulled the trigger, and was a frightening person because he had been violent in the past and had *told* codefendant that he had been convicted of murder.

The effect of Amaro's testimony was limited, as in *People* v. *Goodall, supra,* 131 Cal.App.3d 129, 141, because the jury was instructed that Amaro's testimony could be considered only as to his state of mind, thus further decreasing the prejudice which may have resulted.

Moreover, any error was not sufficiently prejudicial to require reversal, in the light of evidence independent of Amaro's testimony.

Walker's testimony alone provided substantial evidence to support appellant's conviction on the robbery and kidnaping of Collier and Walker. Appellant's statement, "You know where the cemetery is," provided direct evidence that appellant intended to kill Collier and Walker, especially since "cemetery" referred to a vacant lot and not to an actual public cemetery. No witness placed a gun in Amaro's hands during these events, and the gun found near Robert Almaraz at the time of his arrest contained only one round which had been fired, and that one was linked to the shooting of

Tokumoto. A reasonable inference could be drawn from evidence other than Amaro's testimony that appellant personally shot Collier.

Reversal is, therefore, not required on this ground.

## II. *Special Circumstance*

■ Defendant next asserts that the evidence is insufficient to support the special circumstance allegation of killing a witness to a crime within the meaning of section 190.2, subdivision (a)(10). We disagree.

In response to appellant's contention, we have examined the evidence to determine whether any reasonable trier of fact could have found the necessary elements to support the special circumstance finding beyond a reasonable doubt. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 575-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

Appellant contends that the evidence was insufficient because there was no direct evidence that Collier was killed "for the purpose of preventing his testimony in any criminal proceeding . . . ." (§ 190.2, subd. (a)(10).) No rule requires such direct evidence of defendant's purpose. ■ Circumstantial evidence may be sufficient to establish criminal intent (*People* v. *Patino* (1979) 95 Cal.App.3d 11, 27 [156 Cal.Rptr. 815]), and the reviewing court will not substitute its interpretation of the circumstances for the findings of the trier of fact (*People* v. *Grimble* (1981) 116 Cal.App.3d 678, 686 [172 Cal.Rptr. 362]).

■ Substantial circumstantial evidence in this case supports the jury's finding that Collier was murdered to preclude him from testifying in a criminal prosecution for the killing of Tokumoto. Appellant knew that Collier and Walker had accompanied Tokumoto to the apartment. After Tokumoto was shot by Robert Almaraz, no medical help was sought for Tokumoto, and appellant ordered Sagmeister to close the drapes and clean up the blood, thus showing an intention to avoid detection. Appellant took Collier's and Walker's wallets at gunpoint, thus removing their tangible identification and showing that he planned to kill them from the time they left the apartment with his intended victims' hands and mouths taped. Giving directions to the driver, appellant said, "You know where the cemetery is," by which he meant a vacant lot, further showing an intention to kill the two men. Collier was killed by three shots from behind, apparently without a struggle and while bound. Despite the shooting of their friend Tokumoto, neither Walker nor Collier was threatening any of the apartment's occupants, thus ruling out a threatened fight as a motive. The only plausible interpretation of the

evidence supports the special circumstance finding that Collier was killed to prevent his testimony with respect to the murder of Tokumoto.

 Appellant's contention that the special circumstance finding must be reversed because Collier was killed during the commission of the crime to which he was a witness, the killing of Tokumoto, (see § 190.2, subd. (a)(10)) is without merit. On any reasonable interpretation of the facts, the killing of Tokumoto was completed before the sequence of events leading to Collier's murder began. Although Tokumoto's body was not yet disposed of, no established rule extends the commission of an unlawful killing beyond the time of death of the victim. Under applicable principles established with regard to the prohibition on multiple prosecutions (§ 654), we have determined that the killing of Collier did not take place "during the commission . . . of the crime to which he was a witness" (§ 190.2, subd. (a)(10)). Where defendant had separate criminal objectives independent of each other, with separate intent, defendant may be prosecuted on each offense. (See *People* v. *Young* (1981) 120 Cal.App.3d 683 [175 Cal.Rptr. 1].) In this case, a new and separate criminal intent was formed when appellant, after some time had elapsed since Tokumoto's shooting, first approached Walker and Collier and set in motion additional subsequent events that led to Collier's assassination.

 Lastly, appellant contends that the special circumstance must be reversed because the jury could have thought that appellant killed Collier to prevent him from testifying regarding the *kidnaping*. If that were the case, appellant contends the murder would have occurred during the commission of the kidnaping, thus taking it out of the terms of section 190.2, subdivision (a)(10), which requires that the murder not take place during the commission of the other crime. This ingenious contention fails because there was no evidence suggesting appellant's intent was to kill Walker or Collier as witnesses to their own kidnaping, and no reasonable trier of fact could have so found. Moreover, the jury was instructed that they must find, "That the killing was not committed during the commission or attempted commission of the crime to which the person killed was a witness." Therefore, the kidnaping could not have formed the basis for their special circumstance finding.

## III. *Accomplice Instruction*

 Appellant urges reversal because the trial court failed to instruct the jury *sua sponte* that Amaro was an accomplice and, as such, his testimony must be viewed with caution.

Appellant argues the court erred in failing to give two instructions on accomplice testimony: CALJIC No. 3.18, which provides that the testimony

of an accomplice ought to be viewed with distrust, and CALJIC No. 3.11, which provides that a defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect the defendant with the commission of the offense.

Appellant's contention is without merit.

As stated in *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 73-74 [63 Cal.Rptr. 749], "When one of several defendants takes the stand to confess his own guilt and incriminates his codefendants, the accomplice instructions should be given. [Citations.] If, however, each of several defendants testifies in his own defense and none is called as a witness for or against the others, the instructions are not appropriate. [Citation.] Even where one defendant denies participation and incriminates another, the instruction should not be given. (*People* v. *Arends,* 155 Cal.App.2d 496, 512-513 . . . .)"

Amaro was not called as a witness by the prosecution during the trial, electing instead to testify in his own defense. Though incriminating Almaraz in the process, Amaro's testimony was essentially exculpatory and self-serving.

In *People* v. *Terry* (1970) 2 Cal.3d 362, 398-399 [85 Cal.Rptr. 409, 466 P.2d 961], the court considered appellant's contention that the court erred by not giving, on its own motion, instructions that the testimony of an accomplice must be corroborated and that such testimony should be viewed with distrust. The court said the following: "Ordinarily the instructions on accomplice testimony need be given on the court's own motion only when the accomplice witness is called by the People [citations] or when a defendant in testifying implicates his codefendant while confessing his own guilt (*People* v. *Catlin* [1959] 169 Cal.App.2d 247, 255 [337 P.2d 113]). In the latter instance, the confession on the stand, for all practical purposes, relieves the jury of the decision whether the declarant was an accomplice. When a defendant has confessed his guilt, there is little need to worry about prejudicing him by giving an accomplice testimony instruction for the protection of his codefendant. But here Juanelda [codefendant] testified in her own behalf, not as a prosecution witness, and denied her guilt. Thus, it was not incumbent to give the accomplice testimony instructions. [Citation.] [¶] [I]t would appear that where a defendant testifies in his own behalf and denies guilt while incriminating a codefendant, it is at most for the discretion of the trial judge whether to give accomplice testimony instructions on his own motion." (At p. 399.)

Here, any possible error by the trial court in failing to give on its own motion instructions on the law of accomplices was nonprejudicial as it is not probable that a result more favorable to appellant would have been reached in the absence of the error. ██ Moreover, where the defendant's guilt is established by evidence independent of that provided by the accomplice, it is not prejudicial error, in the absence of a request, for the trial court to fail to give the instruction that accomplice testimony must be corroborated (*People* v. *Johnson* (1957) 153 Cal.App.2d 564, 570 [314 P.2d 751]) or that accomplice testimony must be viewed with distrust (*People* v. *Cooper* (1970) 10 Cal.App.3d 96, 103 [88 Cal.Rptr. 919]).

██ In the instant case, appellant's guilt was clearly established by corroborating evidence independent from the testimony of Amaro. Separate and apart from Amaro's version of the events, the testimony of Russell Walker was clearly sufficient to demonstrate appellant's guilt in the murder of Bruce Collier. Given this fact, no prejudicial error resulted from the court's failure to instruct the jury that codefendant Amaro's testimony needed to be corroborated. (See *People* v. *Gordon* (1973) 10 Cal.3d 460, 473 [110 Cal.Rptr. 906, 516 P.2d 298].)

## IV. *Argument to the Jury*

██ Appellant contends the prosecutor's comment to the jury during his closing argument, that most dictionaries define "moral certainty" as a *strong probability,* was misconduct and prejudicial error.

Respondent submits that the prosecutor's statement to the jury was not legally erroneous, citing *People* v. *James* (1980) 102 Cal.App.3d 728, 731-732 [162 Cal.Rptr. 548], which held that the trial court did not err in equating "moral certainty" to "probable certainty."

In any event, immediately following objection to the prosecutor's remark, the trial court in the instant case cured any possible error in that regard, by informing the jury that they were to follow the court's instructions, which included the proper instructions on the reasonable doubt standard of proof. ██ In the absence of strong evidence to the contrary, it must be presumed that the jury followed the court's instructions. (See *People* v. *Beach* (1983) 147 Cal.App.3d 612, 624-625 [195 Cal.Rptr. 381].)

## V. *Reduction of Sentence*

██ Contrary to appellant's assertion, this is not an appropriate case for reduction of his sentence pursuant to *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697]. Unlike the defendant in that case, ap-

pellant has an extensive arrest record for violent offenses and has previously been to state prison for voluntary manslaughter. Appellant was the active participant in all the crimes committed in this case except for the murder of Tokumoto, and, accordingly, his sentence is not disproportionate to those that were eventually imposed on the other two codefendants.

## DISPOSITION

The judgment is affirmed.

McClosky, Acting P. J., and Ringer, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.