[No. G027470. Fourth Dist., Div. Three. Feb. 27, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
ANH VIET QUACH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION†]**

†Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of part III.

## COUNSEL

Neil Auwarter, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela A. Ratner Sobeck and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—Anh Viet Quach was convicted of attempted extortion, attempted second degree robbery, attempted murder, receiving stolen property, three counts of street terrorism, and several firearm violations. Gang enhancements were found to be true with regard to two of the charges.

We affirmed his conviction, but in doing so, we made several pointed comments about the quality of his appellate representation. The attorney who was the subject of those comments subsequently resigned from the bar. In consideration of this, a petition for writ of habeas corpus was filed, requesting recall of the remittitur and reinstatement of the appeal. The Attorney General agreed such relief was appropriate, the writ issued, and the case is before us again. This time we reverse Quach's attempted murder conviction.

* * *

Quach was charged with 14 felonies related to three separate but related incidents. In February 1998, a group of men, including Quach, entered Scott's Spirits, a liquor store in Westminster. One of them handed a lottery ticket to Hoa Nguyen (Hoa), an employee, and daughter of the owner, Quang Nguyen (Quang). Written on the back of the ticket were a telephone number, the monetary figure of $34,000, and the name "Dau Bu," which is Vietnamese for "Big Head." The men indicated that Hoa should give the ticket to Quang and then they departed.

Later that week, at approximately 3:00 p.m., four NIP Family members,[1] including Quach, entered the store and asked Quang about the money. Quang said he did not have it. Quach told him they would return tomorrow and he should have the money or "they [would] do something else." Before leaving the store, Quach made a gun-like gesture with one of his hands.

Quang's wife pressed the silent alarm button, summoning the Westminster police. When the officers arrived, Quang explained what had occurred. Westminster Police Officer Darrick Vincent showed Quang a series of photographs, one of which Quang identified as Quach. No arrests were made at this time. At trial, Vincent testified that Quach was known by the moniker of "Big Head."

The second crime took place about six months later. At 2:00 a.m. on August 30, 1998, a shootout occurred at the Side Pocket bar in Stanton. Eyewitness accounts as to Quach's complicity in the shooting were inconclusive. A group of approximately 16 people, including Quach, exited the bar. They were split somewhat evenly between members of the NIP Family and TRG, two rival gangs. One of the TRG members became agitated and Quach tried to calm him. His efforts failed, and the TRG member pulled a gun from his waistband.

Eyewitness testimony conflicted as to whether Quach also drew a gun at this point. However, Detective William Collins testified he had interviewed

---

[1] A Vietnamese gang located in the City of Westminster, specifically located around the area called Little Saigon.

the eyewitnesses and received accounts which varied both amongst themselves and from those at trial. In the interviews, conducted soon after the incident, the eyewitnesses agreed that the TRG member had pulled a gun and fired it. One even reported he had fired *on Quach*. Their version of the facts was that Quach pulled out his own gun *only after* the TRG member shot. Another eyewitness, a bouncer at the bar, described the incident as an exchange of gunfire, but did not say who fired first. All agreed no one was injured and both combatants fled the scene.

On February 28, 1999, Probation Officer Timothy Todd was working undercover at the Side Pocket bar. Todd had previously spoken with Quach on about 20 occasions. Todd saw Quach converse with a group of people in the parking lot before entering the bar. Thirty to forty-five minutes later, Quach left the bar. He appeared very agitated, and a group of people tried to calm him. They eventually succeeded and brought him back inside the bar, but he emerged again a short while later. This time, Quach retrieved an item from a car, placed the item in his waistband, and walked back toward the bar. Todd believed the item in Quach's waistband was a gun. Before going back into the bar, Quach met a group of men and appeared to hand the firearm to a man wearing a baseball cap.

Todd made contact with the man in the hat and searched him, but found no gun on him. Todd then radioed other officers in the area for assistance. The responding officer, James Fischer, had known Quach since 1996 and was aware of his NIP Family affiliation. Officer Fischer made contact with Quach and ordered him to stop, but he refused to comply and ran. As the chase wound its way past a dumpster, the officer heard the sound of something being thrown into it. Quach was soon apprehended, and a search of the dumpster revealed a handgun.

At trial, several police officers testified to Quach's gang affiliation. Officer Vincent testified about the anti-gang unit to which he belonged, as well as the different types of gangs and gang crimes. He also testified he had been in contact with Quach at least six times and he had admitted to membership in the NIP Family. Deputy Sheriff Thomas Spalding testified that Anthony Passi, a security guard at Side Pocket, had told him the people involved in the shooting were NIP Family gang members. Detective Collins testified Quach was a member of the NIP Family gang and his gang moniker is "Big Head." Officer Fischer also testified Quach was an active gang member.

I

Quach first complains that the trial court failed to instruct with CALJIC Nos. 2.71 or 2.71.7, which would have informed the jury that oral admissions

of a defendant are to be "viewed with caution." He is correct that some instruction to that effect should have been given, but he is unable to convince us it is reasonably probable that a more favorable result would have ensued had such an instruction been given.

After Officers Vincent and Fischer had testified Quach told them he was an active NIP Family gang member on several occasions, Quach took the stand and denied ever having belonged to the NIP Family. But he had NIP Family tattoos and admitted he had told *several* police officers that he was an ex-NIP member. He had signed field interrogation cards to that effect.

The jurors were therefore faced with conflicting testimony from witnesses they had the opportunity to observe and study closely, knowing the importance of their testimony. They were told that in evaluating the testimony of these witnesses, they should remember that while testimony of any one of them was sufficient to prove a fact, they "should carefully review all the evidence upon which the proof of that fact depends." (CALJIC No. 2.27.)

■ This, of course, told them they should exercise caution in reviewing the evidence upon which the fact of Quach's gang membership was based. While not as explicit as a statement that the alleged admissions had to be viewed with caution, we are confident this obligation to exercise caution in considering all the evidence which bore on the proof of any fact—and certainly one as important as his gang membership—accomplished as much as CALJIC No. 2.71 would have. As our Supreme Court said in *People v. Carpenter* (1997) 15 Cal.4th 312, 393 [63 Cal.Rptr.2d 1, 935 P.2d 708], in reviewing a similar contention, "[T]he court fully instructed the jury on judging the credibility of a witness, thus providing guidance on how to determine whether to credit the testimony [of an admission]."

In "carefully reviewing" *all* the evidence on this point, the jury would have considered the expert opinion of Officer Fischer that Quach was a NIP Family member, Quach's testimony that he had been a member, his NIP Family tattoo, the undenied fact he associated with NIP Family members, the undenied fact he was still going by his gang moniker, the fact one witness had told police Quach was flashing gang hand signs on one of the charged occasions, and the fact that *two* officers said he had admitted gang membership—each thus corroborating the other.

It is true, as appellate counsel skillfully points out, that all of these things can be explained away or diminished in importance. But we do not believe the jury's acceptance or rejection of *two* officers' statements about gang membership, corroborated by all the things we have listed and contradicted only by Quach's statement that he *no longer* belonged to the gang, hinged

upon a pivot as delicate as the difference between "evidence of an oral admission . . . shall be viewed with caution," and "you should carefully review all the evidence upon which the proof of [a] fact depends." Where, as here, the jury not only heard testimony about the alleged admissions, but also heard the defendant deny having made them and explain the circumstances, their determination of credibility is much less likely to turn on legal niceties and much more likely to be a matter of look-him-in-the-eye believability than if they had just heard the testimony of a police officer about the admissions. We are persuaded there is no reasonable probability a more favorable result would have followed had the instruction been given.

The same is true with regard to Quach's statements that formed the basis of the extortion charge. Even if Quach is correct in his assertion *People v. Carpenter, supra,* 15 Cal.4th at page 393, governs this case, we have already pointed out that Carpenter provides the paradigm for rejection of Quach's argument: "[T]he court fully instructed the jury on judging the credibility of a witness, thus providing guidance on how to determine whether to credit the testimony. Accordingly, there is no reasonable probability the error was prejudicial; indeed, we would even find the error harmless beyond a reasonable doubt." (*Ibid.*)

In this case, as in *Carpenter*, the jury was instructed to carefully review the evidence upon which the proof of the extortion depended. They were explicitly cautioned about the care to be taken in a situation in which a fact is proved by the testimony of a single witness. On the facts of this case, we do not believe the inclusion of CALJIC Nos. 2.71 or 2.71.7 would have made any difference.

## II

We cannot say the same about the instructional error with regard to CALJIC No. 5.56,[2] which affords the right of self-defense to a mutual combatant only after, inter alia, he has informed his opponent that he has stopped fighting and given his opponent the opportunity to stop.[3] As Quach points out, this is error, and it is error closely tied to the facts of this case. The jury could quite reasonably have concluded this was a mutual combat

---

[2] CALJIC No. 5.56, as given in this case, provides, "The right of self-defense is only available to a person who engages in mutual combat if he has done all the following: 1. He has actually tried, in good faith, to refuse to continue fighting; 2. He has clearly informed his opponent that he wants to stop fighting; 3. He has clearly informed his opponent that he has stopped fighting; and 4. He has given his opponent the opportunity to stop fighting. After he has done these four things, he has the right to self-defense if his opponent continues to fight."

[3] It appears the Attorney General concedes that *some* instruction was necessary on this point. His argument is entirely devoted to taking the position the point was adequately covered by other instructions.

situation. If they did so, they would likely have referred to CALJIC No. 5.56 for the test to be applied, and been misinformed on the crucial test to be applied to such facts. The error thus requires reversal.

The Attorney General treats this as an error of omission, and argues, as he did with regard to the previous instructional error, that other instructions covered the omitted concept. He contends other instructions adequately informed the jury that "when a defendant engages in simple assault and his opponent responds with deadly force so suddenly that the person cannot withdraw, a defendant may immediately use deadly force in self-defense."

And he may be right, in the abstract. A careful reading of CALJIC Nos. 5.30, 5.50, 5.51, 5.52. and 5.55 might lead to that conclusion—were it not specifically and explicitly rejected by CALJIC No. 5.56, which sets out a clear and quite different test. We cannot say with any confidence that the jury engaged in a careful parsing of all the other instructions and, having concluded it was possible to read them so as to contradict CALJIC 5.56, rejected the clear language of that instruction. To state the argument is to be drawn ineluctably to its rejection. We therefore find the instructions inadequate as to the attempted murder and assault with a firearm counts (counts 4 and 5) and reverse those convictions.

█ CALJIC No. 5.56 is the instructional manifestation of Penal Code section 197, which provides that self-defense is available to an assailant or mutual combatant if he first "really and in good faith [has] endeavored to decline any further struggle before the homicide was committed." Somehow, the instruction transmogrified the requirement of a good faith endeavor to decline further combat into a categorical denial of the defense to anyone who has not *succeeded* in clearly informing his opponent that he is no longer fighting and wishes to stop. At least that is how we read the three requirements which follow the requirement of "trying in good faith to refuse to continue fighting" in the instruction, and we cannot find such a rule in Penal Code section 197. See *People v. Hernandez* (2003) 111 Cal.App.4th 582, 589 [3 Cal.Rptr.3d 586] [describing this instruction and CALJIC No. 5.54 as "at least ambiguous"].

Nor can we find any mention in the instructions given in this case of the rule that, "Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . . If the victim uses such force, the aggressor's right of self-defense arises. . . ." (1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses § 75, p. 410), or its corollary, "If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he

cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense." (*People v. Hecker* (1895) 109 Cal. 451, 463–464 [42 P. 307].)

While it is not our province to decide whether these were the facts in this case, they were certainly the facts Quach argued, and we have searched in vain for anything in the instructions given in this case which would have helped the jury arrive at a verdict if they accepted that version of the facts. Indeed, CALJIC No. 5.56 would have seemed to most people rather clearly to reject a self-defense claim founded on that argument.

Interestingly, the point seems to pop up every couple of decades, as though attached to some unseen legal clockwork. It was raised almost 40 years ago, and an alert trial judge avoided the problem by amending an earlier version of the CALJIC instruction on this point, CALJIC No. 6.23, to include this very concept. His instruction, approved by the appellate court, provided, "Where a person seeks or induces a quarrel which leads to the necessity in his own defense of using force against his adversary, the right to stand his ground and thus defend himself is not immediately available to him, but, instead he must first decline to carry on the affray, must honestly endeavor to escape from it, and must fairly and clearly inform his adversary of his desire for peace and of his abandonment of the contest *unless the attack is so sudden and perilous that he cannot withdraw. . . .*" (*People v. Sawyer* (1967) 256 Cal.App.2d 66, 75, fn. 2 [63 Cal.Rptr. 749].) It came up again in 1987 in *People v. Gleghorn*, 193 Cal.App.3d 196, 201 [238 Cal.Rptr. 82], and was solved in virtually identical fashion.

It is certainly not our intention to cast aspersions on the fine work of the Committee on Standard Jury Instructions, Criminal, which deserves the gratitude and admiration of the entire criminal bar, but it does appear that the *Sawyer* and *Gleghorn* holdings represent that exquisitely rare, tiny—but occasionally (very occasionally; once every 20 years) material—part of the law which was omitted from the instruction. While the CALJIC instructions have sometimes struggled to make intelligible to laypersons the difficult concepts of law involved, they have very rarely gotten the law itself wrong. The extraordinarily high quality of the committee's work in that regard probably explains the trial court's reasonable assumption here that the standard CALJIC instructions would be all that was necessary—an assumption appellate courts have generally urged upon bench and bar rather strenuously. Thus, there was no addition here of an instruction such as the one

approved in *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201 [238 Cal.Rptr. 82], which told the jury, "[W]here the counter assault is so sudden and perilous that no opportunity be given to decline further to fight and he cannot retreat with safety he is justified in slaying in self-defense."

The jury in this case was not so instructed. CALJIC No. 5.56 does not contain such an instruction, and in setting out an absolute requirement of successful notification of a declination to continue the fight, likely precluded the jury's distillation of such a rule from the other instructions relied upon by the Attorney General.

Quach argues this error is reversible per se. Citing *People v. Mayberry* (1975) 15 Cal.3d 143, 157 [125 Cal.Rptr. 745, 542 P.2d 1337], and *People v. Lemus* (1988) 203 Cal.App.3d 470, 478–480 [249 Cal.Rptr. 897], he contends this was a failure to instruct upon a defense. We think not. The court *did* instruct on the defense but its instructions were erroneous. Under those circumstances, the appropriate test is the harmless error test of *Chapman v. State of California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].

But the point is academic. Application of the *Chapman* test still requires reversal. We cannot be convinced beyond a reasonable doubt that no jury could have adopted Quach's version of the facts. Several accounts of the fray indicate the initial confrontation was escalated when a TRG member pulled or fired a gun and that Quach may have responded to that provocation. At least one version had the gun fired *at Quach* before he took out his own pistol. He was entitled to an instruction that would have enabled the jury to render a verdict in accordance with such facts.

Instead, counsel was forced to argue to the jury that a mutual combatant could exercise self-defense if he first withdrew from the fight and informed his opponent of this fact. This was not the defense he was entitled to offer, and it made it highly unlikely the jury would cobble together a correct statement of the law regarding sudden and perilous counter assault, as argued by the Attorney General.

Quach's conviction of attempted murder (count 4), assault with a firearm (count 5), and the concomitant enhancements must be reversed.

### III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is reversed.

Rylaarsdam, Acting P. J., and Moore, J., concurred.

---

*See footnote, *ante*, page 294.