Filed 4/2/15  P. v. Tombleson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUSTIN TOMBLESON,<br><br>    Defendant and Appellant. | G048758<br><br>(Super. Ct. No. 11CF1563)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James A. Stotler, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Randall D. Einhorn and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Justin Tombleson of two counts of voluntary manslaughter (Pen. Code, § 192, subd. (a); all further statutory references are to this code), as lesser included offenses of murder (§ 187), and found true a penalty enhancement allegation that he used a deadly weapon (§ 12022, subd. (b)(1) [a knife]) to commit the offenses. In a bifurcated bench trial, the trial court found defendant had committed a prior strike serious felony offense (§ 667) and served a prior prison term (§ 667.5, subd. (b)). Defendant challenges the sufficiency of the evidence to support the trial court's conclusion his prior conviction for battery with serious bodily injury (§ 243, subd. (d)) constituted a prior strike as a serious felony involving personal infliction of great bodily injury on a nonaccomplice (§ 1192.7, subd. (c)(8)). He also challenges the trial court's instruction on an initial aggressor's right of self-defense and contends the court erred in failing sua sponte to instruct the jury on a novel theory of involuntary manslaughter as a lesser included offense. As we explain, these contentions have no merit, and we therefore affirm the judgment.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

After celebrating his birthday party at an upscale bowling alley, Hossain Saidian and his friends Elvis and Aris Kechechian and Peter Pouya Hashemloo departed around 12:15 a.m. Everyone in the group had been drinking. The group stopped to get food at the Albatros Tacos Shop in Lake Forest.[1] While in line at the taco shop, Elvis tried to start a conversation with defendant's girlfriend, Erica Cardenalli, who was standing behind him with two female friends. When Cardenalli did not acknowledge Elvis, he complained loudly to Saidian and Hashemloo, "I guess she's too good to talk to me."

---

[1]     Because Elvis and Aris were brothers and shared the same last name, we will refer to them by their first names for clarity and intend no disrespect.

Hashemloo put his arm around one of Cardinelli's friends, but the women were not interested, and Cardinelli rebuffed Elvis's overtures, explaining, "I was on the phone with my boyfriend, and he's on his way here, and I don't want to talk to you."

A verbal altercation ensued between Elvis and Cardenalli. She told Elvis, "If you don't turn around, I'm going to slap you" and warned that her boyfriend was going to "fuck [him] up," while he called her a "fat bitch" and answered her threat, "Fuck you. He's not going to fuck me up," "[t]ell him to come . . . ." Aris, who had just returned from the bathroom, joined in the shouting match. Cardenalli slapped Elvis in the face. From his position behind a table, Aris spat on Cardinelli and insulted her, "Fuck you, bitch." After more yelling, Aris spat at her again. The women responded by slapping and punching Aris in the face and the back of his head.

Hashemloo pushed Aris away from the women. Aris "backpedal[ed]" and tripped over a man, who then pushed Aris. A fistfight and general melee erupted in the taco shop, with chairs and food flying, and people running out and being pushed out by the restaurant workers. It was "complete chaos." During the fracas, Hashemloo heard Cardenalli say, "He's going to come back and kill you. He's going to come fuck you up." Outside the restaurant, Hashemloo heard Cardenalli telling someone on her phone that she had been punched and "telling him to hurry and directing him to" Hashemloo's group.

As Hashemloo and his friends headed for Aris's car, Elvis and Saidian took off their shirts because as Hashemloo explained, they were "very proud of their bodies [and] well-built." Defendant arrived at the scene and a customer at the taco shop, Hussein Wareh, testified he saw defendant speaking with Cardenelli before rushing at Hashemloo's group. According to Hashemloo, defendant approached "very aggressive[ly]," demanded to know who spit on his girlfriend, and then punched at Aris. Hashemloo knocked defendant to the ground. Hashemloo testified he and his friends beat

defendant while he was on the ground, but only for a "very short period [of] time, a few seconds."

Hussein Wareh saw defendant being beaten up, knocked to the ground, and, once he was on the ground, "attacked more with . . . not just fists but feet at that point," and the blows include "[s]tomping, kicking, punching." According to Wareh, defendant's trio of attackers then "stopped, and they backed away from him. And then he had a moment where he was just on the ground, and I could see his [defendant's] face at that point was very bloody, and his nose was very bloody." Wareh reiterated that the trio backed off from defendant, who was still laying on the ground. Wareh testified, "[It] didn't look like their intentions [were] to keep beating him to death or whatever. It just felt to me like they got him enough times, and they backed — they just . . . they stopped. They stopped stomping on him."

Wareh testified that defendant "appeared to me to be very angry still" and "then reached into his pocket, which was his left-side pocket, and he pulled out an object." "[A]nd it appeared that he was opening a knife." Defendant approached his former attackers, and Wareh saw defendant "swinging his arms in a stabbing motion." Wareh "heard the punctures to the body" made by defendant's knife as he stabbed two victims, explaining, "It sounded like . . . a thud, but more of a pop thud." According to Wareh, when defendant stood up and pulled out the knife, nothing prevented him from retreating. Wareh testified he saw two men come to defendant's aid. One man had started fighting with Aris while defendant gained his composure and stood up. The other man approached defendant's side and gave him "the moment to get up."

Defendant's friends Joshua and Jonathan Jarrett testified they stayed in the car initially when they arrived with defendant at the taco shop, but went to defendant's aid when he was knocked down. Joshua tackled one man and Jonathan pushed another away while defendant was still on the ground. The brothers testified they did not know a stabbing occurred.

4

Another witness, Ali Wareh, testified he did not see anyone continue to beat defendant while he was on the ground. But defendant put his hands in his pocket, took them out, and then did a "flickering motion" with one hand — an outward motion as if opening something. Ali Wareh saw defendant move forward toward a "taller guy in the white shirt" (Elvis) and make a swinging motion. At that point, Wareh warned the women with him to go back to the restaurant because he thought defendant "might have had something sharp in his hand or something." When Wareh turned back to look, the man in the white shirt was "already knocked out." Wareh saw Saidian, with whom he was acquainted, advance towards defendant "in [an] attacking" mode, but defendant "kind of like sw[u]ng at him twice around [Saidian]'s left side of his ribs," and Saidian began "getting kind of like weak." Wareh could not remember if Saidian fell to the ground.

Another witness, Daniel Jacobs, testified he did not notice any weapons, but he saw defendant "bouncing around from person to person" and saw him make four stabbing-type motions. Jacobs testified, "To me it appeared that he [defendant] was going from one to another without being swung at or hit and he was the aggressor on that." Another customer, Keaton English, saw defendant throwing punches in a manner he characterized as "unorthodox[], out of anger," and in a circular motion. English saw the outline of a knife in defendant's hand.

Hashemloo saw Aris lying face down and held in a bear hug by someone; Hashemloo heard Aris screaming to him, "Pooh, come get this guy off of me. Help me." As Hashemloo tried to help Aris, Elvis yelled, "Pooh, call 911. Someone just stabbed me." Hashemloo saw Elvis standing up, "kind of in shock" and "holding his intestines in his hands; they were out about four inches out of his body." Hashemloo called 911, and then turned to see Elvis lying on the ground and Saidian stumbling back towards him "in shock" and "bleeding profusely . . . everywhere," with "open holes" on his body. Still on

5

the phone with 911, Hashemloo grabbed Saidian, walked him to the side of Aris's car and next to Elvis, and told Saidian to lie down and not move.

Orange County Sheriff's Deputy Daniel Mendoza arrived and found Aris screaming, "Somebody . . . hurt my brother. He needs help. He needs help." Elvis was on the ground breathing slowly; he "appeared to have been stabbed or cut. Some of the stomach parts were out on his belly." Saidian lay nearby, where he kept trying to stand up, but was "bleeding severely." He suffered lacerations on his left-upper arm, and was wounded in his left armpit and chest area. Surgery revealed he had a laceration to one of his lungs from a puncture wound that left a visible hole in his diaphragm. Elvis died that night, and Saidian succumbed a few days later. Autopsies showed Elvis died from an abdominal stab wound and Saidian from multiple stab wounds.

Investigators found a pocket knife in the bushes near the taco shop. Forensic analysis revealed defendant and Saidian as main contributors of DNA residue on the knife, and Elvis as a minor contributor. Cardenalli testified defendant the next day admitted to her he "probably" had a knife or "probably" stabbed someone. He said he was sorry, and that he was going to meet with an attorney. He turned himself into the sheriff's office on June 13, 2011, accompanied by his attorney.

Defendant did not testify at trial or present any witnesses, claiming in argument that he acted in self-defense. After the jury returned its verdict, the trial court sentenced defendant to 30 years and four months in state prison, consisting of the mid-term of six years on each voluntary manslaughter conviction, doubled to 12 years each because of his prior serious felony strike, plus an additional five years for the strike and 16 months for personal use of a deadly weapon. Defendant now appeals.

6

II

DISCUSSION

A.  *Prior Serious Felony Strike Finding*

Defendant challenges the sufficiency of the evidence to support the trial court's finding his prior conviction for battery with serious bodily injury (§ 243, subd. (d)) constituted a serious felony strike conviction (§§ 667, subd. (d)(1); 1192.7, subd. (c)).  Battery with serious bodily injury is not one of the crimes listed in section 1192.7, subdivision (c) as a "serious felony."  (See *People v. Bueno* (2006) 143 Cal.App.4th 1503, 1508 9 *Bueno*).)  Battery qualifies as a serious felony only if the circumstances of the offense show the defendant personally inflicted great bodily injury on a person other than an accomplice (§ 1192.7, subd. (c)(8)), or personally used a firearm or other dangerous or deadly weapon (*id.*, subd. (c)(23); see *Bueno*, at p. 1508.)

Defendant pleaded guilty to the prior serious bodily injury offense, and the plea agreement reflects as the factual basis for the plea only his statement that "[i]n Orange County, California, on 6/11/04, I willfully [and] unlawfully committed a battery upon David Everett causing serious bodily injury . . . ."  The trial court in the present matter took judicial notice of the "court file" pertaining to defendant's serious bodily injury conviction (Case No. 05SF0072), and concluded the conviction constituted a prior serious felony strike.  The court file included the plea agreement.

Defendant contends the evidence does not support the trial court's conclusion.  He notes his battery conviction did not include firearm or deadly weapon enhancements, and neither the factual statement in his plea agreement or the least adjudicated elements (*In re Jensen* (2001) 92 Cal.App.4th 262, 268) of battery with serious bodily injury establish that he personally inflicted great bodily injury on a person who was not an accomplice, as required to constitute a serious felony.  (§ 1192.7, subd. (c)(8) & (23).)

7

The Attorney General argues that because nothing suggests anyone else was charged for the battery offense or that an accomplice was the victim, the trial court could conclude defendant was the sole perpetrator and personally inflicted the victim's injuries (see *People v. Moore* (1992) 10 Cal.App.4th 1868, 1871), while defendant points to contrary authority (*Bueno*, *supra*, 143 Cal.App.4th at pp. 1508, 1511).  The Attorney General also relies on authority suggesting that serious bodily injury in section 243, subdivision (d) may be "'essentially equivalent'" to great bodily injury (*Bueno,* at p. 1511; see *People v. Santana* (2013) 56 Cal.4th 999, 1008), while defendant identifies a case in which the jury found the defendant inflicted serious bodily injury but not great bodily injury, suggesting they are not necessarily the same.  (*People v. Taylor* (2004) 118 Cal.App.4th 11, 26.)

We need not resolve these disputes.  In producing on appeal only the abstract of judgment for defendant's prior conviction, a certified "prison packet," the plea agreement, and other documents, the parties did not include everything in the court file the trial court reviewed.  We requested and obtained the court file, which includes the battery victim's preliminary hearing testimony that he had never met defendant before a confrontation in which defendant punched him in the face, knocked him unconscious, "busted up" his eye socket, and broke three bones in his cheek.  As defendant acknowledges, the trial court in adjudicating prior conviction allegations may draw reasonable inferences from the record of conviction (*People v. Guerrero* (1988) 44 Cal.3d 343, 355), which properly includes charging documents, any plea documents, and transcripts of the preliminary hearing and sentencing hearing (*People v. Gonzales* (2005) 131 Cal.App.4th 767, 773).  Here, the injuries the victim described unquestionably qualify as great bodily injury (see, e.g., *People v. Sanchez* (1982) 131 Cal.App.3d 718, 733), and the evidence reflects defendant personally inflicted them on a nonaccomplice.  Substantial evidence therefore supports the trial court's prior serious felony strike conclusion.

8

B.      *Initial Aggressor's Right of Self-Defense*

Defendant describes himself as the initial aggressor in his confrontation with the victims, acknowledging he "started the fight:  When [he] showed up in the parking lot, Erica pointed out the guys who spit on her in the taco shop and [he] sprinted over to the red M3 BMW and swung at Aris."  The trial court instructed the jury with CALCRIM No. 3471 (Right to Self-Defense:  Mutual Combat or Initial Aggressor), and defendant now challenges language in the latter portion of the instruction.  The initial portion of the instruction provides:  "A person who starts a fight has a right to self-defense only if:  [¶]  1.  He actually and in good faith tried to stop fighting; [¶] AND [¶] 2.  He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶]  If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight."

The latter portion of the instruction provides:  "However, if the defendant used only non-deadly force, and the opponent responded with such sudden *and deadly* force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."  (Italics added.)

Defendant argues the instruction erroneously required the victim to respond with "deadly" counterforce before an initial aggressor may invoke self-defense.  Defendant suggests a victim's resort to any "excessive" force would restore an initial aggressor's right to use *deadly* force in self-defense.  Defendant cites no authority for this proposition.  He also did not request a pinpoint instruction or modification of the instruction to include "excessive" force, and his challenge is therefore forfeited.  (*People v. Anderson* (2011) 51 Cal.4th 989, 998 (*Anderson*); *People v. Hart* (1999) 20 Cal.4th 546, 622 (*Hart*).)

9

In any event, defendant's claim fails on the merits. Granted, defendant is correct to a point: an initial aggressor faced with "sudden excessive force need not attempt to withdraw and may use *reasonably necessary* force in self-defense." (CALJIC No. 5.56, italics added.) As noted in *People v. Quach* (2004) 116 Cal.App.4th 294, 301, "'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly *or other excessive force*. . . . If the victim uses such force, the aggressor's right of self-defense arises.'" (Italics added.) But *Quach* did not suggest a defendant's "'right of self-defense'" includes *lethal* force to meet the victim's use of excessive *but nondeadly* force, and defendant cites no authority for this proposition. Indeed, the authority he cites states the opposite: "[O]nly that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified." (*People v. Clark* (1982) 130 Cal.App.3d 371, 380, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

Here, the issue was whether defendant was entitled to use deadly force. Accordingly, the trial court correctly instructed the jury to resolve whether the victims posed a deadly threat (CALCRIM No. 3471) to defendant or his girlfriend (CALCRIM No. 505 — Justifiable Homicide: Self-Defense or Defense of Another), or whether defendant instead inaccurately but honestly perceived a deadly threat (CALCRIM No. 571 — Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another) or acted under provocation in a heat of passion (CALCRIM No. 570 — Voluntary Manslaughter: Heat of Passion). The trial court also correctly instructed the jury to evaluate whether any danger defendant may have faced continued to exist when he claimed he acted in self-defense (CALCRIM No. 3474), and defendant does not suggest there was any evidence he acted with less than deadly force or that the court erred in instructing the right of self-defense may not be contrived (CALCRIM No. 3472). In sum, the trial court instructed the jury correctly and thoroughly on the law of self-defense.

10

Because defendant acted with lethal force, we find no merit in his contention the jury should have engaged in a fine-tuned evaluation of whether the victims acted with "excessive" force instead of whether they posed a deadly threat to defendant. The trial court correctly instructed the jury that only a deadly threat or perceived deadly threat revived defendant's right as an initial aggressor to use deadly force in self-defense or imperfect self-defense. There was no error.

C. *Assault with a Deadly Weapon as a Predicate Act for Involuntary Manslaughter*

Defendant claims on appeal that involuntary manslaughter may be the result where the defendant's underlying offense is assault with a deadly weapon, a felony. By statute, a defendant commits involuntary manslaughter when he or she kills another human being without malice (1) in the commission of a criminal offense not amounting to a felony, or (2) in the commission of a lawful act which might produce death, either by (a) committing the ordinarily lawful act in an unlawful manner or (b) without due caution and circumspection. (§ 192, subd. (b).) The trial court *did* instruct the jury on involuntary manslaughter as a lesser included offense of murder based on the nonfelonious crimes of "simple assault, simple battery, and/or disturbing the peace." Defendant contends the trial court erred in failing sua sponte to instruct the jury on his novel theory of involuntary manslaughter based on assault with a deadly weapon as the predicate act. He is incorrect for several reasons.

First, because the trial court instructed the jury on involuntary manslaughter as a lesser included offense of murder, defendant's claim amounts to an assertion the trial court should have modified the instruction in the pinpoint manner he now requests. His failure to request a modification or pinpoint instruction below forfeits the challenge. (*Anderson*, *supra*, 51 Cal.4th at p. 998; *Hart*, *supra*, 20 Cal.4th at p. 622.)

Second, there is no authority for defendant's suggested instruction. In a concurring opinion in *People v. Bryant* (2013) 56 Cal.4th 959 (*Bryant*), Justice Kennard endorsed an involuntary manslaughter instruction where the defense "presented evidence

11

from which the jury could have reasonably concluded that defendant lacked malice, but killed while committing an assault with a deadly weapon." (*Id.* at p. 975 (conc. opn. of Kennard, J.).) There, in a struggle with her boyfriend for a knife, the defendant gained control of the weapon and broke free, but she unintentionally stabbed him in the chest with the blade as he came towards her, killing him. Neighbors found her pleading with him as he lay unconscious to "'wake up.'" (*Id.* at p. 963.)

The majority in *Bryant*, however, did not reach the issue of whether an involuntary manslaughter instruction should have been given. (*Bryant*, *supra*, 56 Cal.4th at p. 970 [addressing only the defendant's request for a voluntary manslaughter instruction].) In any event, Justice Kennard concluded the trial court had no sua sponte duty to instruct "on a legal principle [assaultive involuntary manslaughter] that has been so 'obfuscated by infrequent reference and inadequate elucidation' that it cannot be considered a general principle of law." (*Id.* at p. 975 (conc. opn. of Kennard, J.), citing *People v. Flannel* (1979) 25 Cal.3d 668, 681 (*Flannel*).) Defendant contends "the *Flannel* 'inadequate elucidation' doctrine is incompatible with [a] federal due process" right to accurate legal instructions, but the Supreme Court's conclusion is binding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Third, even assuming we would or could overlook the foregoing flaws, there is no point in considering the merits of defendant's suggested instruction because no evidence supports it. The trial court has no duty to instruct on lesser included offenses not supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) In *Bryant*, the defendant testified she did not intend to kill her boyfriend and a jury could have concluded she lacked the alternate component of malice, a conscious disregard for life, because she stabbed him in the heat of struggling for the knife. Here, defendant did not testify and there was no evidence he did not appreciate the risk posed by the knife. Rather, he drew the knife from his pocket and flipped it open to confront

12

his victims.  Consequently, the trial court did not err in failing sua sponte to modify the involuntary manslaughter instruction.

III

DISPOSITION

The judgment is affirmed.


ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

13