Filed 6/10/21  P. v. Martinez CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>MARK JAMES MARTINEZ,<br><br>　　Defendant and Appellant. | 2d Crim. No. B299222<br>(Super. Ct. No. 2014010150)<br>(Ventura County) |

A jury convicted appellant Mark J. Martinez on one count of murder in the first degree (Penal Code, § 187, subd. (a)[1]) and on one count of shooting at an inhabited dwelling (§ 246).  It found true allegations he intentionally discharged a firearm causing death (§ 12022.53, subd. (d)) and committed both offenses as an active participant in a criminal street gang (§ 190.2, subd. (a)(22)).  The court sentenced appellant to life without parole plus 25 years on the first count and to a consecutive term of 40 years to life on the second count.  He appeals.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

Appellant challenges the jury's rejection of his self-defense theory and raises purported instructional errors relating to that theory. He also argues the People elicited improper testimony from its gang expert about appellant's guilt. Lastly, he contends the trial court erred when it applied the multiple victim exception to his conviction for shooting at an inhabited dwelling and declined to stay his sentence on that charge.

We affirm the judgment as modified below.

STATEMENT OF FACTS

On the afternoon of Saturday, March 29, 2014, Norma Elizalde did laundry on the back porch of her home at 1211 High Street in Santa Paula. Her 14-year-old son Ricardo played video games in the living room. Ricardo thought he heard gunfire and rose from his chair to investigate. He peered through the screen of the front door and saw a man crouched on the sidewalk. As he turned and ran to find his mother, bullets shattered the living room window. He hid in the kitchen and began calling her name. Ms. Elizalde emerged from the rear doorway of the home and fell to the ground, bleeding heavily from her neck and unable to talk.

Ricardo's screams caught the attention of Norma's brother, Nicolas Ramos, who lived next door. The two attempted to slow her bleeding while waiting for first responders. Norma's twin sister Irma joined their efforts. Police and paramedics arrived promptly but their attempts to revive her failed. The medical examiner later determined a bullet had entered her neck and pierced her aorta, heart, and lungs before coming to rest near her armpit.

Several eyewitnesses helped police piece together the events leading up to the shooting. A customer at nearby Neighborhood Market recalled hearing what sounded like a car backfiring. He turned and saw a man standing next to a black

Infiniti firing a pistol toward two men fleeing down High Street. Another witness remembered seeing the distinctive black car as she worked at a taco stand in the market's parking lot. She saw the driver and his passenger get out, shoot, then get back in and drive away. Two low-resolution surveillance cameras at Neighborhood Market recorded portions of the shooting.

The victim's brother, Ramos, told police two young men walked by his house as he was finishing yard work that afternoon. One of them made hand signs and yelled out a gang name in the direction of a black Infiniti sedan coming from the nearby intersection of High Street and 12th Street. The driver and his passenger yelled out a different gang name, stopped, and got out. The four immediately began brawling in the street. Ramos dialed 911 and fled to the backyard when he heard two sets of gunshots in succession. He returned to the front expecting to see one of the combatants lying wounded or dead in the street, but all four had vanished. His nephew Ricardo's screams then drew him next door.

Ramos recognized the driver of the car as appellant Mark "Basik" Martinez. The men shared an acquaintance. Santa Paula police knew the 31-year-old Martinez as a longtime member of a local street gang called the Crazy Boyz. His passenger was a younger member named Jessie "Foe" Ruiz. The pair were arrested along with the two suspected pedestrians, Valente "Tiny" Tobias and Ernesto "Silencio" Marron, who Ramos likewise recognized and understood to be members of another gang called the 12th Street Locos.

Marron was the only suspect to provide an account to law enforcement. He said he and Tobias were walking to Neighborhood Market when Tobias noticed the occupants of a black Infiniti staring at them from the intersection of High Street

3

and 12th Street. Marron had a .45 caliber pistol tucked into the waistband of his sweat pants. As they approached the car, the passenger rolled down the window and asked, "Where you from?" Tobias responded, "12th Street Locos Tiny." The driver and passenger replied "Crazy Boyz gang" and got out of the car. Marron watched as the passenger fought with Tobias. The driver then came around the car and hit Marron in the head. When Marron stumbled, the pistol dislodged from his waistband and fell through his pant leg to the ground. He picked it up, shot several times in the driver's direction, and began running. The driver retrieved his own gun from the car and started shooting at the fleeing Marron. Ballistics experts traced the 9mm bullet that struck Ms. Elizalde to casings found in the street near the driver's approximate location. When police searched appellant's home three days after the shooting they found an empty carrying case for a 9mm pistol registered to appellant's wife.

PROCEDURAL HISTORY

At trial, prosecutors theorized appellant and Ruiz were intentionally cruising in 12th Street Locos' territory to provoke a confrontation. A gang expert testified that calling out "where you from?" to a potential rival all but invited a deadly response. In contrast, defense counsel characterized the brawl as a chance encounter that turned deadly only after Marron began firing at appellant. Appellant immediately returned fire, they explained, to defend himself in a kill-or-be-killed situation.

Jurors found appellant guilty of both murder and shooting at an inhabited dwelling. They found true allegations he intentionally discharged a firearm causing death and that he committed both offenses for the benefit of a criminal street gang. Defense counsel asked the trial court to stay appellant's sentence on the second count because it was based on the same acts as the

4

first count.  It denied the request.  The presence of Ms. Elizalde's son in the home, the court held, meant appellant could be punished separately for each offense under the multiple victim exception to Penal Code section 654.  Appellant appealed.

DISCUSSION

*1. Sufficiency of the Evidence at Trial*

Appellant contends the uncontested evidence shows he provoked only a non-deadly fistfight.  Marron's deadly and excessive response, he argues, entitled him to return fire in self-defense.  (See *People v. Quach* (2004) 116 Cal.App.4th 294, 301, quoting 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses § 75, p. 410 ["'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . .  If the victim uses such force, the aggressor's right of self-defense arises. . . .'"].)  Appellant contends the evidence was insufficient to show he acted unreasonably under the circumstances.

We review the record in the light most favorable to the judgment to determine if it discloses substantial evidence from which the jury could have found appellant guilty beyond a reasonable doubt.  (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.)  Substantial evidence must be "reasonable, credible, and of solid value."  (*Id.* at p. 507.)

The record does not present an open-and-shut case of self-defense.  Inconsistent testimony about the duration of time between Marron's shots and appellant's shots left jurors to resolve an important factual dispute.  Ricardo Elizalde testified enough time passed for him to get up from his computer, go to the front door, spot a man crouching on the sidewalk, and begin running toward the kitchen to find his mother.  Other witnesses estimated anywhere between half a second to more than 20

5

seconds elapsed.  Jurors could have interpreted this evidence as showing enough time passed that Marron no longer posed a threat to appellant when the latter returned fire.

Appellant next argues Marron alone is responsible for escalating the confrontation from a fistfight into a gun battle. The evidence on this point was also in conflict.  Marron testified the driver and passenger of the car asked him "Where you from?" A detective familiar with Santa Paula's gang culture testified this question is often a prelude to armed confrontations between members of different gangs.  The immediate and violent reaction of appellant and Ruiz to Tobias's response corroborated the detective's opinion.  The jury could also have considered the speed with which appellant retrieved a loaded pistol from his car as showing he had a weapon at the ready, knowing an assault on two members of a different gang could turn deadly.  These facts could have reasonably justified the jury's findings.  (*People v. Cravens*, *supra*, 53 Cal.4th at p. 508.)

*2. Jury Instruction on Causation*

The trial court's jury instructions included CALCRIM 505, "Justifiable Homicide:  Self-Defense or Defense of Another."  This told the jury it could consider Ms. Elizande's killing justified if appellant "believed there was imminent danger of death or great bodily injury to himself" and "acted only because of that belief."[2] This echoes section 198, which requires:  (1) the circumstances of

---

[2] CALCRIM 505 as issued stated in relevant part:  "Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to himself.  Defendant's belief must have been reasonable and he must have acted only because of that belief."

6

a justified killing to be "sufficient to excite the fears of a reasonable person"; and (2) the defendant to "have acted under the influence of such fears alone."

Appellant contends CALCRIM 505 is ambiguous because it does not contemplate "mixed motive" killings, i.e., those in which the defendant harbors motives other than fear when killing in self-defense. The trial court should have clarified this ambiguity, he asserts, by instructing the jury *sua sponte* that fear of imminent danger or death or great bodily injury must have been a "substantial factor" in appellant's decision to shoot at Marron, but not necessarily the only factor.[3]

Appellant frames his case as an opportunity for this court to clarify whether section 198 accommodates those who act with "mixed motives."[4] He proposes we answer this question by

---

[3] Appellant suggests a modified version of CALCRIM 240 could have served this purpose. He proposes the following in his opening brief:

"When CALCRIM No. 505 states that 'Defendant's belief must have been reasonable and he must have acted only because of this belief,' this means that a killing in self-defense is not justified if some motive other than reasonable fear was a 'cause' of the killing.

"A motive caused the defendant to kill if the killing was the direct, natural, and probable consequence of that motive and the defendant would not have killed absent that motive. [. . .]

"There may have been more than one cause of a killing. A motive caused the defendant to kill only if it was a substantial motivating factor. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only motivating factor."

[4] Appellant identifies the dicta below from *People v. Nguyen* (2015) 61 Cal.4th 1015, 1046 as leaving this question open: "We

equating the section 198.2 "fear alone" standard of causation with a "substantial factor" standard. (See e.g., *In re M.S.* (1995) 10 Cal.4th 698, 716 [substantial factor causation standard implied under hate crime statute; crime could have multiple concurrent causes so long as "prohibited bias was a substantial factor in the commission of the crime"].) Appellant characterizes defense counsel's failure to propose such an instruction as ineffective assistance of counsel.[5]

We decline to graft a substantial factor standard onto section 198. This would require us to ignore the statute's directive that one invoking self-defense must have "*acted* under the influence of such fears [of imminent harm or death] *alone*." (Italics added.) Instructing the jury that section 198 permits the defendant to have been motivated by *other* factors, whether substantial or not, would contravene the statute's plain language. (See *People v. Trevino, supra,* 200 Cal.App.3d at p. 879 ["The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force"].) We conclude the trial court properly instructed the jury using

note that defendant did not argue in the trial court, nor has he argued on appeal, that the jury should have been instructed that acting based on mixed motives is permissible so long as reasonable fear was the but-for cause of his decision to kill. We therefore have no occasion to consider whether such a rule would be consistent with section 198 as interpreted in [*People v. Trevino* (1988) 200 Cal.App.3d 874] or other cases."

[5] Appellant raises ineffective assistance of counsel in this appeal as well as in a subsequently filed petition for writ of habeas corpus. (See *In re Mark James Martinez*, Court of Appeal No. B311136.) We will decide his petition separately.

CALCRIM 505 under these circumstances. As such, defense counsel did not fall below an objective standard of reasonableness by not requesting a causation instruction like the one proposed by appellant. (See *People v. Mai* (2013) 57 Cal.4th 986, 1009 ["[A] reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance"].)

### 3. *Jury Instruction on Contrived Self-Defense*

Appellant argues the trial court erred by instructing the jury on "contrived self-defense"[6] because the instruction suggests the initiator of a non-deadly confrontation can never assert self-defense, even when the victim escalates the situation by using deadly force. (See *People v. Ramirez* (2015) 233 Cal.App.4th 940, 945 [contrived self-defense instruction misled jurors because it "made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence"].) The trial court addressed the same concern by adding prophylactic language to the form instruction.[7] We conclude substantial evidence supported the initial instruction and that the trial

---

[6] CALCRIM 3472 states: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

[7] The court added the following sentence to form CALCRIM 3472: *"If the defendant intended to provoke only a non-deadly altercation and the other party responded with deadly force, this instruction does not apply."* (Italics added.) This additional text appears consistent with CALCRIM 3472's bench notes, which highlighted the need to modify the instruction "in the rare case in which a defendant intends to provoke only a non-deadly confrontation and the victim responds with deadly force." Appellant's is one such "rare case."

9

court's modification relieved any tension created by the instruction's use under these circumstances.

### 4. Prosecutorial Misconduct

Appellant contends prosecutorial misconduct occurred during closing argument when the People insisted self-defense could not apply because appellant and Ruiz instigated the fight with Marron and Tobias. We find no misstatement of law in the record. The prosecutor's closing argument aligned with the People's theory of contrived self-defense, which, as stated in modified CALCRIM 3472, required proving appellant intended to provoke a deadly rather than non-deadly response.

Appellant also argues defense counsel provided ineffective assistance by not objecting when the prosecutor purportedly misstated the law to jurors. Defense counsel's decision to forego what would have been a weak or meritless objection at this point did not constitute ineffective assistance of counsel.

### 5. Expert Testimony About Appellant's Guilt

The People called Detective Allen Macias to testify about whether appellant committed the charged crimes as an active participant in a criminal street gang. (§ 190.2, subd. (a)(22).) Macias described how the department used a Field Identification (FI) database to track the city's suspected gang members. He used a printout from the database to recall appellant's long history of gang-related contacts with police. The prosecutor examining Macias then posed a detailed hypothetical in which an individual with appellant's background shot Ms. Elizalde under identical circumstances. Macias concluded her death was gang related. Defense counsel cross-examined him at length about this opinion and the hypothetical upon which it was based.

Appellant argues the trial court erred by allowing the People to stray from the hypothetical during its redirect

10

examination of Macias.  He points to the following exchange between prosecutor and witness:

"Q.    Now, you talked about -- [defense] counsel asked you a series of questions about the progression of contacts for individuals and how that can show patterns and help understand subsequent criminal conduct.  *With respect to the defendant in this case*, the contacts that we've seen over the years culminating in a shooting of 12th Street Locos out in the street that ends up killing Mrs. Elizalde, do you see that as the progression where the progression ended to ultimately now we have a murder?  (Italics added.)

"A.    Yes."

Appellant maintains this exchange violated the well-established rule that "a witness cannot express an opinion concerning the guilt or innocence of the defendant."  (*People v. Torres* (1995) 33 Cal.App.4th 37, 46; *People v. Prince* (2007) 40 Cal.4th 1179, 1227 ["an expert's opinion that a defendant is guilty is both unhelpful to the jury . . . and too helpful, in that the testimony may give the jury the impression that the issue has been decided and need not be the subject of deliberation"].)  While the People's redirect did blur the line between appellant and his fictional counterpart, the record shows defense counsel repeatedly did the same while cross-examining Macias about the hypothetical.  The court did not abuse its discretion by permitting the People to do so briefly on redirect examination.

In addition, jurors heard from other sources about the gang-related nature of appellant's confrontation with Tobias and Marron.  Appellant concedes the evidence established he and Ruiz belonged to the Crazy Boyz gang and Tobias and Marron to the 12th Street Locos.  Ramos testified the combatants on both sides exchanged their gang affiliations before starting their

11

fistfight. Marron explained the meaning of the question "where you from" and how appellant and Ruiz yelled "Crazy Boyz gang" before attacking him and Tobias. Jurors could conclude from these facts alone appellant acted for the benefit of a criminal street gang when he fired at Marron.

### 6. Multiple Punishments for a Single Act

Penal Code section 654 "permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent," thereby circumventing section 654, subdivision (a)'s prohibition on multiple punishments for the same act. (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784.) The trial court cited section 654 when it imposed consecutive sentences for murder (count 1) and for shooting at an inhabited dwelling (count 2). Appellant argues the exception should not apply because charging documents did not identify Ricardo Elizalde as a separate victim and because the People did not introduce evidence of his victim status at the preliminary hearing. We do not agree.

The amended felony information identified 1211 High Street as the "dwelling" for the purposes of count 2. At the preliminary hearing, an officer recalled Ramos telling him shortly after the shooting that Ms. Elizalde lived at this address with her "husband and two children." Ramos became aware of his sister's condition when her son Ricardo began "yelling that his mother had been shot." This evidence shows at least one person other than Ms. Elizalde was in the house at the time of the shooting. In addition, the People were not required to name each victim in the information. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101 ["a number of cases have upheld the application of the multiple victim exception based on evidence of multiple victims, without considering whether the identities of those victims had

12

been pleaded"].)  Appellant need not have been aware of the identity or number of people in a building to face punishment for each victim separately.  (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1631, citing *People v. Anderson* (1990) 221 Cal.App.3d 331.)  The trial court properly applied the exception under these circumstances.

*7. Court Fees*

The abstract of judgment imposed a court security fee and a criminal conviction assessment against appellant.  The reporter's transcript of his sentencing mentions neither fee.  The superior court shall strike both from the abstract.

DISPOSITION

We direct the trial court to strike the court security fee and criminal conviction assessment from the abstract of judgment.  Judgment is affirmed as modified.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P.J.


TANGEMAN, J.


13

Derek D. Malan, Judge
Superior Court County of Ventura

_____

David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.