Filed 7/2/21  P. v. McKinney CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B299448 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA115548) |
| v. | |
| TIMOTHY JAMES MOLANO McKINNEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven D. Blades, Judge.  Affirmed.

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel and Stacy S. Schwartz, Deputy Attorneys General, for Plaintiff and Respondent.

---

## INTRODUCTION

In June 2017, appellant Timothy James Molano McKinney fatally shot Joseph Aguilar. In May 2019, rejecting appellant's claim that he acted in self-defense, a jury convicted him of voluntary manslaughter, and found true the allegation that he used a firearm during the killing. The court sentenced appellant to a total of 21 years: 11 years for manslaughter, and 10 years for using a firearm during the crime.

Appellant requests we reverse the judgment, contending: (a) the court omitted a crucial portion of a justifiable homicide instruction, and erred in giving an instruction on mutual combat; and (b) he received ineffective assistance of counsel because his counsel: (1) failed to elicit evidence of methamphetamines in Aguilar's system; (2) failed to elicit sufficient evidence of Aguilar's gang membership; (3) agreed to the giving of the mutual combat jury instruction; (4) misstated the law in his closing argument; and (5) failed, at appellant's sentencing hearing, to submit evidence that would aid him in a future youth offender parole hearing, for which appellant will be eligible

2

after his fifteenth year of incarceration.  Appellant also requests we remand to permit the court to hold a hearing in which he can put such information on the record.[1]  We decline the remand request and affirm the judgment.

## STATEMENT OF RELEVANT FACTS

### A.  *Before Trial*

An information was filed in December 2017, charging appellant with one count of murder and alleging he used a firearm in the commission of the offense.

Prior to trial, the court ruled that appellant could "bring out evidence that the victim [Aguilar] had methamphetamines in his system as determined during the autopsy."  It further suggested that upon proper proof, the defense could elicit evidence of Aguilar's gang membership.

### B.  *Trial*

#### 1.  *Opening Statements*

Trial began on May 16, 2019.  In the prosecutor's opening statement, he laid out the basic facts of the events.  Appellant had attended a party held in the backyard of the Aguilar family residence; a brawl had broken out after Aguilar asked what gang appellant and his friends were from, and as the partygoers exited the backyard for the front

---

[1]     These hearings are referred to as *Franklin* hearings, after *People v. Franklin* (2016) 63 Cal.4th 261.

3

yard, Aguilar "lunge[d], or r[a]n[] at" appellant, and appellant shot him.

Defense counsel told the jury that Aguilar had a knife and was trying to attack appellant when he was shot. He also stated the evidence would show that Aguilar had methamphetamines and alcohol in his body. He concluded that even if the jury found appellant had killed Aguilar, "it was a justifiable killing," and the jury would be compelled to find appellant not guilty.

### 2. *Testimony*

Multiple witnesses testified at trial, including Aguilar's friends, several members of his family, and appellant's friends, all of whom were present when the shooting occurred. Several professionals (police officers, a crime scene investigator, and a coroner) also testified. All the witnesses mainly agreed on the basic gist of the events.

At the invitation of Roxanne Martinez, appellant, along with his friends Henry Aviles, Roberto Flores, Joseph Rangel, and Jeremiah Rayford, attended a party held in the backyard of a home belonging to the Aguilar family on June 16, 2017. Though several of appellant's friends testified that the partygoers "looked like gang members," they nevertheless joined the party. The party was peaceful for the first few hours, with the attendees playing drinking games, listening to music, and hanging out.

After appellant had been there for a while, Martinez introduced Aguilar to appellant and his friends. When

4

Aguilar asked appellant's friends where they were from, Aviles responded he was from the Eastside Village Crips.[2] Aguilar swung at him and a fight broke out. Testimony differed on how many people were involved, but both Flores and Martinez's friend Katie Provencio testified appellant was among those fighting. After Aguilar's father attempted to break up the melee, the partygoers began moving to the front yard. Provencio heard appellant say "that somebody hit him and the hits were like nothing and that he'll fight again." Appellant appeared angry and "animated."

As appellant was leaving the backyard, he was involved in an altercation with one of Aguilar's sisters.[3] No one disputes Aguilar approached appellant, and both his father and one of his sisters testified they unsuccessfully tried to stop him from doing so. Testimony differed on whether Aguilar had a knife, but the majority of the

_____

[2] Flores testified that Aguilar looked "gang-affiliated," and Aviles testified that Aguilar introduced himself as "Trigger." Defense counsel also elicited from the coroner that Aguilar had a "P" tattooed on his forehead. Martinez testified that she had told detectives Aguilar was a "hothead," though she also testified that she knew him to be a "mellow person."

[3] In a recorded interview with detectives, Aguilar's brother Jessy said he saw people surrounding his sister and after "push[ing] them off" her, fought with one who appeared to have a gun. There was no evidence anyone other than appellant used a gun that night.

witnesses testified they did not see him with a knife.[4] Appellant then shot Aguilar and, according to numerous witnesses, fired another shot before fleeing with his friends in their cars.

Martinez testified that appellant ordered her to get into the car with Aviles and him. As appellant drove away, he bragged, "You don't know me, you don't know me, I'm the real nigga." Jessy Aguilar told detectives that as appellant drove away, he yelled out the car window, "Catch another one." The morning after the incident, appellant contacted Aviles and stated he shot Aguilar because Aguilar had tried to stab Rangel. But in a recorded visit with his parents, appellant denied shooting Aguilar and claimed Aviles was the shooter.

### 3. *Jury Instructions and Closing Arguments*

After the defense rested, the court discussed jury instructions with the attorneys. Among those discussed was CALCRIM No. 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor).[5] The court accepted the prosecutor's

---

[4] An officer responding to the scene after Aguilar was shot testified he saw a blood-covered knife on the ground, but the knife disappeared before he had a chance to recover it.

[5] "A person who engages in mutual combat or starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would *(Fn. is continued on the next page.)*

argument that the instruction was warranted based on the testimony that appellant had been fighting in the backyard, and was prepared to continue fighting. Defense counsel objected that the instruction applied to an "initial aggressor," but the court pointed out that it applied to "Mutual Combat *or* Initial Aggressor." Defense counsel responded, "Mutual combat I can see."

After the People put on a rebuttal witness, the court instructed the jury. The jury instructions included a modified version of CALCRIM No. 505 (Justifiable Homicide: Self-Defense or Defense of Another), which provided, in pertinent part: "The defendant is not guilty of murder if he was justified in killing someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if: [¶] 1. The defendant reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury. [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND [¶] 3. The defendant used no more force than was

---

understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting. . . . A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (CALCRIM No. 3471.)

reasonably necessary to defend against that danger."[6]  It additionally instructed the jury that "[w]hen deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed" and that a defendant's belief "may be reasonable even if he relied on information that was not true" as long as he "actually and reasonably . . . believed that the information was true."

The instructions also included CALCRIM Nos. 200 (Duties of Judge and Jury),[7] 570 (Voluntary Manslaughter: Heat of Passion—Lesser Included Offense (Pen. Code, § 192(a)),[8] 571 (Voluntary Manslaughter: Imperfect Self-Defense or Imperfect Defense of Another—Lesser

---

[6]    Unmodified, the first sentence of CALCRIM 505 is: "The defendant is not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter) if (he/she) was justified in (killing/attempting to kill) someone in (self-defense/ [or] defense of another)."

[7]    This instruction provided in pertinent part that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."  (CALCRIM No. 200.)

[8]    "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." (CALCRIM No. 570.)  The instruction elaborated further on the meaning of "sudden quarrel" and "heat of passion."

8

Included Offense (Pen. Code, § 192)),[9] and 3471 (Right to Self-Defense: Mutual Combat or Initial Aggressor). Included in the language of CALCRIM 571 was the following: "If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime."

During closing arguments, the prosecutor argued the evidence demonstrated appellant was guilty of murder in the second degree. Acknowledging that if the jury concluded appellant acted in self-defense he could be guilty of no crime, the prosecutor explained, "So is this murder in the second degree? Or first? Is this voluntary manslaughter under heat of passion or imperfect self-defense? Or is this a justified homicide? Because a justified homicide means . . . if you find the defendant not guilty of first degree murder, not guilty of second degree murder, not guilty of voluntary manslaughter under heat of passion or imperfect self-defense, you're saying that the defendant is protected by

---

[9] "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable." (CALCRIM No. 571.) The instruction further provided that "[i]n evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant."

the law of self-defense. He is literally enshrined with that cloak. He's a hundred percent lawfully legally justified in taking the life of another human being, and he walks out this door with everybody else. A free man. Justified in what he did on June 16, 2017. That's what justified homicide really means."

Defense counsel argued appellant killed Aguilar in self-defense or in defense of another. He concluded, "even though [appellant] shot and killed Joseph Aguilar, it's a clear case of either self-defense or defense of another, namely Joseph Rangel who was standing next to [appellant]. Therefore it's considered justifiable homicide, and by law you must find him not guilty of the crime of murder."

In rebuttal, the prosecutor agreed the jury should find the killing was justified if it believed Aguilar rushed appellant while holding a knife, but argued that such testimony was not credible. He acknowledged the presence of a knife at the scene, but noted that only appellant's witnesses had placed the knife with Aguilar.

### 4. *Verdict and Sentencing*

After final closing instructions, the jurors were dismissed for lunch. At 3:36 p.m., they reached a verdict, finding appellant guilty of voluntary manslaughter, and finding true the allegation that he used a firearm in committing the crime.

At the sentencing hearing, appellant's counsel submitted a letter from appellant to the court and to

Aguilar's family, accepting responsibility for his actions. Both sides also had submitted sentencing memoranda. Defense counsel argued that appellant had acted in self-defense, and opined that appellant was remorseful and wanted to "do good." The court sentenced appellant to 21 years in prison, 11 for manslaughter, and 10 years for the use of a firearm. Appellant timely appealed.

## DISCUSSION

### A.  *The Jury Instructions Do Not Require Reversal*

"The trial court is charged with instructing upon every theory of the case supported by substantial evidence . . . ." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047.)  "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Delgado* (2017) 2 Cal.5th 544, 574.)  The "'"absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."'" (*Ibid.*)

The People contend that any instructional error should be reviewed under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [error should result in reversal only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].  Appellant contends that any error

should be reviewed under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 [reversal required unless we "declare a belief that [the error] was harmless beyond a reasonable doubt"]. Because we find any error harmless under either standard, we do not resolve this dispute.

### 1. *Self-Defense*

The version of CALCRIM 505 with which the court instructed the jury stated appellant was "not guilty of murder if he was justified in killing someone in self-defense or defense of another," but did not also state appellant would not be guilty of manslaughter if he was justified in the killing. However, the jury was also instructed with CALCRIM 571, which provided in pertinent part that a "killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense. [¶] If you conclude the defendant acted in complete self-defense, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief in the need to use deadly force was reasonable."

Appellant argues these instructions "did not allow the jury to reach a verdict of not guilty on voluntary manslaughter if it found that he acted in self-defense." He additionally contends he was prejudiced by the omission of manslaughter from CALCRIM 505 because, while CALCRIM

12

571 instructed the jury to find him "not guilty of any crime" if his "belief in the need to use deadly force was reasonable," the instruction provided no guidance to the jury on how to determine reasonableness; appellant contends such guidance was found only in CALCRIM 505. We are unpersuaded. Even assuming the court erred in omitting the words "or manslaughter" from CALCRIM 505, we find the error harmless.

First, it is self-evident that the instructions allowed the jury to reach a verdict of not guilty on voluntary manslaughter if it found appellant acted in reasonable self-defense. Instructing the jury that it must find appellant "not guilty of any crime," necessarily includes finding him not guilty of manslaughter.

Second, it does not matter whether the jury had been specifically instructed that reasonable self-defense was a defense to manslaughter, because the verdict demonstrates the jury rejected a conclusion that appellant acted in reasonable self-defense. Both jury instructions that could lead to a conviction for voluntary manslaughter -- CALCRIM 570 and 571 -- presupposed the jury had already found appellant would otherwise be guilty of murder.[10] But the

_____

[10] The first sentence of CALCRIM 570 provides that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." The first sentence of CALCRIM 571 provides that "[a] killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense."

version of CALCRIM 505 given to the jury stated that a defendant is not guilty of murder if he acted in reasonable self-defense.  Thus, before the jury could find appellant guilty of voluntary manslaughter, it must necessarily have rejected the conclusion that he acted in reasonable self-defense; had it accepted that defense, he would not otherwise be guilty of murder and could not be guilty of voluntary manslaughter.  It is therefore irrelevant whether the jury was explicitly told that reasonable self-defense was a defense to manslaughter.

Third, contrary to appellant's contention, CALCRIM 571 provides guidance on how to determine whether a defendant's belief is reasonable -- it instructs a jury to "consider all the circumstances as they were known and appeared to the defendant."  While CALCRIM 505 provides additional guidance on how to determine the reasonableness of appellant's belief, that does not render CALCRIM 571's guidance insufficient.  The jury was also instructed with CALCRIM 200 that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."  To the extent the guidance provided in CALCRIM 571 is less robust than that in CALCRIM 505, we find the ordinary, everyday meaning of "reasonable" bridges the gap.  Accordingly, any error resulting from the omission of "or manslaughter" from CALCRIM 505 was harmless beyond a reasonable doubt, as there is no reasonable probability that the inclusion of those

14

two words would have resulted in an outcome more favorable to appellant.[11]

## 2. *Mutual Combat*

CALCRIM 3471 provides that "A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." When discussing this instruction with counsel, the court accepted the prosecutor's argument that the jury could find mutual combat from the testimony that appellant had been fighting with Aguilar in the backyard, and was prepared to continue fighting. Defense counsel did not object to this reasoning -- his only concern was that the instruction applied to an "initial aggressor"; he agreed the evidence warranted a finding of mutual combat. ("Mutual combat I can see.")

On appeal, appellant argues the court erred in giving this instruction because there was no substantial evidence that the fight between Aguilar and appellant was mutual

---

[11] In his reply brief appellant argues that pursuant to *People v. Quach* (2004) 116 Cal.App.4th 294, we must reverse because the CALCRIM 505 instruction stating that self-defense was a defense to murder contradicted CALCRIM 571, which stated self-defense was a defense to manslaughter. (See *id.* at 300-303 [when court gave a jury instruction that misstated the law, reversal was warranted even if other instructions court gave might have implied the correct law, because correct law may have led to acquittal].) We perceive no contradiction, and thus find *Quach* inapplicable.

combat.  The People contend appellant forfeited this argument because defense counsel acquiesced to the instruction.  "Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) However, we have discretion to consider such a challenge on appeal, and do so here.  (*People v. Foster* (2010) 50 Cal.4th 1301, 1346, fn. 9; Pen. Code, § 1259.)

A court "should instruct the jury on every theory of the case, but only to the extent each is supported by substantial evidence."  (*People v. Flannel* (1979) 25 Cal.3d 668, 685.) While the evidence supporting a mutual combat instruction was by no means overwhelming, we find it sufficient to warrant the giving of the instruction.

Two witnesses testified that appellant had been fighting in the backyard when the initial melee broke out. One also testified that as appellant was leaving the backyard, he said, "the hits were like nothing and that he'll fight again."  Another witness stated that he fought with someone in the front yard who turned out to have a gun (i.e., appellant).  From this testimony, a jury could conclude that appellant had agreed to continue in the front yard the brawl begun with Aguilar and others in the backyard; thus any fight between Aguilar and appellant occurred by implied, mutual consent.  We discern no error in giving the instruction.

16

**B.** *Appellant Fails to Establish Ineffective Assistance of Counsel*

To succeed on a claim of ineffective assistance of counsel, appellant must show that his "counsel's performance fell below a standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "If a defendant fails to show prejudice, a reviewing court may reject the claim without determining the adequacy of counsel's performance." (*People v. Mendoza* (2000) 24 Cal.4th 130, 170.)

Appellant claims ineffective assistance of counsel because his counsel: (1) failed to elicit evidence that Aguilar had methamphetamines in his system; (2) failed to elicit evidence that Aguilar belonged to a gang; (3) agreed to the giving of the mutual combat jury instruction; (4) failed to explain the law correctly in his closing argument; and (5) failed to put in the record evidence that would be useful to appellant when his youthful offender parole hearing takes place after his fifteenth year of incarceration. We address each contention in turn.

**1.** *Aguilar Being Under the Influence of Methamphetamines*

In his opening statement, appellant's counsel stated "the evidence will show that Joseph Aguilar had methamphetamines in his body and alcohol in his body." Counsel failed to present evidence that Aguilar had methamphetamines in his system, though such evidence was

17

available.[12]  Appellant argues that his counsel's failure to elicit this evidence prejudiced him because "the failure to produce a promised witness or critical testimony may amount to ineffective assistance of counsel if it is not attributable to a reasonable tactical decision."

Appellant has failed to demonstrate this evidence was "critical testimony."  While being under the influence of methamphetamines could explain Aguilar's aggressive behavior, it was uncontradicted that he behaved aggressively.  No witnesses disputed that Aguilar instigated the fight in the backyard.  No one denied that Aguilar approached appellant before he was shot, and both Aguilar's father and one of his sisters testified they tried unsuccessfully to stop Aguilar from doing so.  In his opening statement, the prosecutor flatly admitted that Aguilar had "lunge[d], or run[] at" appellant, before appellant shot him. We fail to see the significance of whether Aguilar approached appellant because he was a "hothead," as Martinez testified, because he was under the influence of methamphetamines, or for some other reason.  The relevant evidence was that Aguilar approached appellant -- a fact the prosecution conceded.  Because appellant has failed to demonstrate prejudice, we reject his claim of ineffective assistance.

_____

[12]     The court had ruled that defense counsel could "bring out evidence that the victim had methamphetamines in his system as determined during the autopsy," but counsel elicited from the coroner only that Aguilar had a "P" tattooed on his forehead.

18

### 2. *Gang Membership*

Appellant argues his counsel ineffectively cross-examined several witnesses about Aguilar's gang membership, though evidence of the gang membership was elicited at the preliminary hearing. Appellant contends Aguilar's gang membership was relevant to his self-defense claim, because it established Aguilar's "violent character or reputation." We find applicable here the same analysis applied to his claim regarding methamphetamines. While Aguilar's gang membership may have explained why he acted aggressively, there was no dispute that he did, and thus his motivation had little relevance.

In any case, there was ample evidence of Aguilar's gang membership. Aviles testified that Aguilar introduced himself as "Trigger," presumably a gang moniker. Other witnesses testified that the partygoers "looked like gang members," and one specifically stated Aguilar "looked gang-affiliated." Multiple witnesses testified that Aguilar's first interaction with appellant and his friends was to ask what gang they were from. Finally, defense counsel elicited from the coroner that Aguilar had a "P" tattooed on his forehead. On this record, it is inconceivable the jury did not understand Aguilar to be affiliated with a gang.

### 3. *Mutual Combat Jury Instruction*

In his supplemental brief, appellant argues that his counsel was ineffective because he acquiesced to the giving of the mutual combat jury instruction. As stated above,

19

substantial evidence supported the giving of that instruction; counsel cannot be faulted for failing to object to an instruction supported by substantial evidence. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1234 [because mutual combat instruction was supported by substantial evidence, "the court would properly have denied any defense objection, [and defendant] was not prejudiced by the failure to object"].) Moreover, a review of the record makes clear the court would have overruled any objection to the instruction based on lack of substantial evidence. (*People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].) Given that appellant has been permitted to raise the appropriateness of this instruction on appeal, he demonstrates no prejudice from his counsel's failure to object.

### 4. *Allegedly Incorrect Statement of Law in Closing Argument*

Appellant contends he received ineffective assistance of counsel because, by arguing to the jury that if the killing of Aguilar was a clear case of self-defense or defense of another "it's considered justifiable homicide, and by law you must find him not guilty of the crime of murder," defense counsel "reduced the prosecution's burden by misstating the law and implying that [appellant] could only be found guilty of manslaughter even if he acted in complete self-defense." We disagree.

The prosecutor's closing argument left no doubt that the jury's finding that appellant acted in self-defense would preclude his conviction for either murder or manslaughter: "A justified homicide means this: It means . . . if you find the defendant not guilty of first degree murder, not guilty of second degree murder, not guilty of voluntary manslaughter under heat of passion or imperfect self-defense, you're saying that the defendant is protected by the law of self-defense. He is literally enshrined with that cloak.  He's a hundred percent lawfully legally justified in taking the life of another human being, and he walks out this door with everybody else.  A free man."  Given the prosecutor's acknowledgment that self-defense was a complete defense to manslaughter as well as murder, defense counsel's failure to reiterate that it was a defense to manslaughter did not fall below the standard of reasonable competency.  Additionally, given the prosecutor's statement, and the jury instructions making clear that reasonable self-defense was a defense to any crime, appellant has failed to demonstrate prejudice.

### 5. Franklin *Factors*

Penal Code section 3051, subdivision (b)(1), provides: "A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a determinate sentence shall be eligible for release on parole at a youth offender parole hearing during the person's 15th year of incarceration."  In such a hearing, the parole board should

21

review "information regarding the juvenile offender's characteristics and circumstances at the time of the offense." (*People v. Franklin* (2016) 63 Cal.4th 261, 283 (*Franklin*).) Appellant contends his counsel was ineffective because he failed to place such information in the record.

Appellant points to nothing in the record that indicates there were favorable characteristics and circumstances that his counsel failed to submit at the sentencing hearing. Given that he initially lied to his parents about being the shooter and tried to blame the killing on one of his friends, it is conceivable there were no favorable characteristics to be placed in the record. Appellant has again failed to demonstrate prejudice.

## C. *We Decline to Remand for a* Franklin *Hearing*

Aside from his claim that his counsel was ineffective for failing to place on the record information that would help him at a youth offender parole hearing, appellant also requests that we remand and instruct the court to hold a *Franklin* hearing. We decline. Appellant may request a *Franklin* hearing by other means.

In *Franklin*, our Supreme Court was faced with a situation in which a defendant who would be eligible for a youth offender parole hearing under the newly enacted Penal Code sections 3051 and 4801 had potentially not been "given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth." (*Franklin, supra,*

22

63 Cal.4th at 269.) Because it was unclear "whether [the defendant] had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing," the court "remand[ed] the matter to the trial court for a determination of whether [the defendant] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Id.* at 284.)

Here, by contrast, appellant's sentencing hearing in June 2019 occurred more than five years after section 3051 took effect, and more than three years after *Franklin* was decided. He had ample opportunity to submit whatever mitigating information he wanted. The record discloses that, at his sentencing hearing, appellant's counsel submitted both a sentencing memorandum, and a letter from appellant accepting responsibility for his actions, which letter counsel read into the record. In addition, when appellant's counsel was asked if he had anything else to present before the court pronounced sentence, counsel only renewed his argument that appellant acted in self-defense, and opined that appellant was remorseful and wanted to "do good"; counsel had nothing else to offer.

Appellant cites *People v. Carranza* (2019) 40 Cal.App.5th 673, rehg. granted Oct. 16, 2019, in support of his argument that we should remand for a *Franklin* hearing. *Carranza* discussed the importance of preserving information relevant to an eventual youth offender parole hearing and concluded that, although nothing prevented the

defendant from asking for a *Franklin* hearing, "his trial counsel submitted no sentencing memoranda, documents, or testimony relevant to a future youth offender parole hearing. Neither defense counsel, the prosecutor, nor the trial court mentioned the future youth offender parole hearing, or appeared to be aware that the sentencing hearing was the preferred time to place on the record evidence relevant to the youth offender parole hearing." (*Id.* at 683.) Given those circumstances, even though the defendant was sentenced after *Franklin* was decided, the court remanded the matter to hold a *Franklin* hearing. (*Id.* at 680, 684.)

*Carranza* was criticized by *People v. Medrano* (2019) 40 Cal.App.5th 961, 968, fn. 9, review den. Jan. 2, 2020, S259021 (*Medrano*): "We do not find the reasoning in *Carranza* persuasive, and we decline to follow it. In our view, *Carranza* fails to articulate a sound basis for declining to apply to the right to a *Franklin* proceeding the same forfeiture rules that apply to countless other rights in criminal proceedings. In addition, *Carranza* reasons that because (1) claims of ineffective assistance of counsel 'typically fail' on direct appeal, and (2) under [*In re*] *Cook* [(2019) 7 Cal.5th 439 (*Cook*)] a petition for writ of habeas corpus is not an appropriate vehicle for seeking a *Franklin* proceeding either, it follows that (3) the right to a *Franklin* proceeding should not be subject to forfeiture by inaction, because such inaction might be the result of ineffective assistance for which there appears to be no remedy. [Citation.] We disagree. *Cook* held that a habeas corpus

24

petition is not an appropriate vehicle for seeking a *Franklin* proceeding because there *is* an adequate remedy at law, namely, a motion under section 1203.01. (*Cook, supra*, 7 Cal.5th at p. 447.)"[13] Therefore, "because [the defendant] was sentenced one and one-half years after *Franklin*, and because nothing in the record indicates that [the defendant] lacked an adequate opportunity at sentencing to make a record of mitigating youth-related evidence, we see no basis to order the same relief that the Supreme Court granted in *Franklin*." (*Medrano, supra*, 40 Cal.App.5th at 963.)

Less than two weeks after *Medrano* was issued, the *Carranza* court granted a petition for rehearing (thus vacating its prior opinion) and subsequently reversed itself. (*People v. Carranza* (Nov. 6, 2019, A152211) 2019 Cal.App.Unpub. LEXIS 7407, *2, fn. 2 [nonpub. opn.] ["On September 30, 2019, this court filed a decision remanding

---

[13] In *Cook*, our Supreme Court was confronted with the question of how "a juvenile offender with a final conviction [could] gain access to the trial court for an evidence preservation proceeding" to submit evidence that would be helpful to a youth offender parole hearing, and whether a petition for a writ of habeas corpus was a proper procedure for that purpose. (*Cook, supra*, 7 Cal.5th at 451.) The court concluded that "[i]n cases with final judgments, [Penal Code] section 1203.01 gives the trial court authority to conduct an evidence preservation proceeding as envisioned in *Franklin*." (*Id.* at 452.) Therefore, it instructed the Court of Appeal to deny the defendant's petition for writ of habeas corpus, "without prejudice to [the defendant]'s filing a motion in the trial court for a *Franklin* proceeding under the authority of section 1203.01 and today's decision." (*Id.* at 460.)

with directions that the trial court conduct a *Franklin* proceeding.  On October 16, this court granted respondent's petition for rehearing based on the decision in *Medrano, supra,* 40 Cal.App.5th 961.  The grant of rehearing vacated our September 30 decision.  (Cal. Rules of Court, rule 8.268(d).)"]; *id.* at *18-*19 ["Because appellant has not shown the trial court's sentence was unauthorized for failure to conduct a *Franklin* proceeding, or shown any other basis to deviate from the *Scott* forfeiture rule, we deny appellant's request for remand for a *Franklin* proceeding.  Appellant may, however, seek such a proceeding under section 1203.01"].)

We agree with *Medrano* (and the subsequent decision in *Carranza*), and decline appellant's request to remand for the court to hold a *Franklin* hearing, without prejudice to his filing a motion "for a *Franklin* proceeding under the authority of section 1203.01" and *Cook*.  (*Cook, supra,* 7 Cal.5th at 460.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.

27